**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HO-HO-KUS, INC., <br><br> *Plaintiff/Counterclaim Defendant*, <br><br> v. <br><br> STEVEN SUCHARSKI, JANEEN SUCHARSKI and SAJE AEROSPACE, INC., <br><br> *Defendants/Counterclaim Plaintiffs*. | Civil Action No.: 2:23-cv-01677 |

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION.................................................................1

II.  FACTUAL BACKGROUND .......................................................7

    A.   HHK's Business and the Aerospace Fastener Industry.........7

    B.   Sucharski's Background and Employment at HHK .............8

    C.   Sucharski Objects and Refuses Nepola's Unlawful Demands
    .................................................................................9

    D.   HHK Retaliates Against Sucharski ...................................12

    E.   Sucharski Retained No HHK Property Or Information.....16

    F.   HHK Continues to Retaliate Against Sucharski and
    Defames Sucharski and Saje Just as Saje Plans to Launch. 17

III. STANDARD OF REVIEW .................................................20

IV.  ARGUMENT.................................................................21

    A.   Sucharski Has Stated a Claim Under CEPA. .....................21

        1.   Sucharski Has Alleged His Reasonable Belief that HHK's
        Demands and Were Unlawful and Deceptive....................23

        2.   Sucharski Has Plausibly and Expressly Pleaded His
        Engagement in Protected Activity Under CEPA. .............32

        3.   Sucharski Has Plausibly and Sufficiently Pleaded
        Causation.................................................................35

    B.   Sucharski and Saje Have Stated Claims for Defamation...38

V.   CONCLUSION.................................................................40

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Abbamont v. Piscataway Twp. Bd. of Educ.*,
   650 A.2d 958 (N.J. 1994) ........................................................................22

*Animal Science Products, Inc. v. China Minmetals Corp.*,
   654 F.3d 462 (3d Cir. 2011) ...................................................................20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................................21

*Beasley v. Passaic Cnty.*,
   873 A.2d 673 (N.J. Super. App. Div. 2005) ............................................35

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................ 20, 21

*Blackburn v. United Parcel Serv., Inc.*,
   3 F. Supp. 2d 504 (D.N.J. 1998), *aff'd*, 179 F.3d 81 (3d Cir. 1999) ..............27

*Chadwick v. St. James Smokehouse, Inc.*,
   No. 14-2708, 2015 WL 1399121 (D.N.J. Mar. 26, 2015) ............................21

*Compare Floorgraphics, Inc. v. New Am. Mktg. In-Store Servs., Inc.*,
   No. CIV 04-3500 AET, 2006 WL 2846268 (D.N.J. Sept. 29, 2006) ..............40

*Donofry v. Autotote Sys., Inc.*,
   795 A.2d 260 (N.J. Super. Ct. App. Div. 2001) .........................................36

*Dzwonar v. McDevitt*,
   828 A.2d 893 (N.J. 2003) ............................................................22, 23, 35

*Fair Wind Sailing, Inc. v. Dempster*,
   764 F.3d 303 (3d Cir. 2014) ...................................................................20

*Farrell v. Planters Lifesavers Co.*,
   206 F.3d 271 (3d Cir. 2000) ...................................................................36

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3rd Cir. 2009) ..................................................................21

*Henson v. Daimler Truck N. Am. LLC*,
   No. 22-CV-6479, 2023 WL 3072532 (D.N.J. Apr. 25, 2023)........................ 33

*Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*,
   431 F. Supp. 3d 518 (D.N.J. 2019)............................................................ 20

*Maimone v. Atl. City*,
   903 A.2d 1055 (N.J. 2006) ....................................................................... 24

*Mangan v. Corporate Synergies Grp., Inc.*,
   834 F. Supp. 2d 199 (D.N.J. 2011) ........................................................... 38

*Mehlman v. Mobil Oil Corp.*,
   707 A.2d 1000 (1998)............................................................................... 23

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008)...................................................................... 20

*Pryor v. Nat'l Collegiate Athletic Ass'n.*,
   288 F.3d 548 (3d Cir. 2002)...................................................................... 20

*Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*,
   449 F. Supp. 3d 449 (D.N.J. 2020) ..................................................... 38, 39

*Robert v. Autopart Int'l*,
   No. 14-CV-07266, 2015 WL 4031740 (D.N.J. June 30, 2015).................... 23

*Robles v. U.S. Env't Universal Servs., Inc.*,
   469 F. App'x 104 (3d Cir. 2012)........................................................ 35, 36

*Ross v. Bd. of Educ. Greater Egg Harbor Reg. High Sch. Dist.*,
   658 F. App'x 97 (3d Cir. 2016).................................................................. 38

*Sciore v. Phung*,
   No. CV 19-13775, 2022 WL 950261 (D.N.J. Mar. 30, 2022) ...................... 40

*Stapleton v. DSW, Inc.*,
   931 F. Supp. 2d 635 (D.N.J. 2013) ..................................................... 33, 35

*Young v. Schering Corp.*,
   645 A.2d 1238 (N.J. Super. Ct. App. Div. 1994)...........................22, 33, 35

**Statutes**

18 U.S.C. § 1833(b)(3)(A) ................................................................ 31

31 U.S.C. § 3729 ............................................................................ 26

49 U.S.C. § 42121 .......................................................................... 30

49 U.S.C. § 44701(a)(1) ................................................................. 27

N.J. Stat. Ann. § 34:19-3 .................................................... 22, 29, 30

N.J. Stat. Ann. § 34:19-3(a)(1) ..................................................... 33

**Other Authorities**

14 C.F.R. § 3.5 .............................................................................. 28

Federal Rule of Civil Procedure Rule 12(b)(6) ............................. 20

## I.    <u>INTRODUCTION</u>

As pleaded in detail in the Amended Counterclaims, Ho-Ho-Kus, Inc. ("HHK") engaged in a pattern of retaliation against Steven Sucharski ("Sucharski") through its owner and Chairman, Tom Nepola, and his hired gun, Jeffrey Roberts, related to Sucharski's objections to and refusal to abide Nepola's unlawful, deceptive, and unsafe business demands, and for Sucharski's assertion of his rights to consult with counsel and be free from retaliation as a potential whistleblower.

It began in the spring of 2022 with Nepola's demands that Sucharski force Stuart Kennedy ("Kennedy")—the site manager at HHK's Virginia facility—to cut corners and hurriedly activate a passivation tank and to then fire Kennedy if he would not comply with Nepola's unlawful, unsafe demands. Kennedy and Sucharski refused Nepola's demands to operate the Virginia passivation tank without necessary measures first being taken to ensure safety and to comply lawfully with customer orders and manufacturing and finishing specifications—including for latches paid for by the federal government. Beyond safety concerns and the compliance matters that would be raised during HHK's imminent AS9100 Recertification Audit, the risks of complying with Nepola's passivation demands were significant and obvious:

- without proper protocols and measures, HHK would breach contractual obligations to customers by failing to meet order requirements;

- HHK would be deceiving customers by fulfilling orders under the false pretense (and false written certification) that they had been manufactured and finished in accordance with order specifications—

specifications also intended to promote safety and longevity and anti-corrosion of the products at issue and their intended use in aircraft; and

- HHK would be potentially liable under the False Claims Act as to orders paid for by the federal government that did not meet specifications or which were falsely certified as having been produced and inspected to meet those specifications.

Firing Kennedy—as Nepola demanded of Sucharski—would have exacerbated those risks. It would constitute retaliation against Kennedy for his refusal to abide Nepola's unlawful, deceptive, and unsafe demands, and it would have led to Nepola replacing Kennedy with a "yes man" willing to blindly follow Nepola's demands (as Nepola later did following Sucharski's retaliatory termination).

Nepola's unlawful demands and HHK's retaliation against Sucharski continued into the summer of 2022. Sucharski objected to and refused to abide by what he considered to be Nepola's unlawful demands to deceive auditors and manipulate records in connection with HHK's AS9100 Recertification Audit (the "Audit") and to bar Kennedy and Mike Provost ("Provost") (then an HHK Quality Assurance Manager) from being present during the Audit out of Nepola's stated fear of what they would disclose to the auditors.

The Audit was not a trivial private review, as HHK seems to suggest in its Motion to Dismiss. AS9100 certification is a common requirement of customers' orders and specifications and a common requirement for bidding on and fulfilling orders of aerospace parts for the U.S. government and government contractors,

including for use by the military. Nepola's unlawful demands in relation to the Audit are themselves proof of the importance he and HHK placed on passing the Audit and retaining AS9100 certification. But Sucharski again openly refused to abide Nepola's demands with respect to the Audit, and when HHK failed the Audit, HHK began to scapegoat Sucharski for the outcome of the Audit and to retaliate against him for his objections and refusal to abide Nepola's unlawful demands.

First, Nepola, working with Roberts on behalf of HHK, demoted Sucharski and concocted a pretextual reassignment within HHK to a newly formed line of business supposedly focused on spare, after-market parts for the commercial aerospace market. While HHK portrayed this pretextual shuffling as a reorganization, the reality was that HHK dedicated no resources to the purported line of new business. Nepola, by his own admission, ghosted Sucharski, leaving Sucharski marooned and isolated, all with the intent to intimidate Sucharski into silence. HHK then ratcheted up the retaliation and intimidation further, trying to force Sucharski to sign an onerous non-disclosure agreement with penalties for telling the truth to authorities and for asserting Sucharski's rights as a whistleblower and employee, and setting Sucharski up for termination.

When Nepola and Roberts presented that "Intellectual Property Acknowledgement" to Sucharski, they both represented that Boeing had demanded HHK create the agreement. Yet when Sucharski asked for documented proof of that,

they failed to provide anything, confirming their motives. Sucharski also confronted Nepola and Roberts about his concern that they were, through their actions and the agreement, setting up employees of HHK to take the blame for HHK's own failures and misconduct. In raising those objections with Nepola (and Roberts), just as he had with other of Nepola's unlawful demands in the past, Sucharski was concerned about the legal ramifications of the agreement and HHK's conduct, and requested an opportunity to consult with legal counsel, as is his indisputable right. But the response Sucharski received was continued anger, with Nepola and Roberts demanding daily that Sucharski sign the agreement or face termination.

In the end, HHK refused to accommodate Sucharski's lawful, reasonable request to consult with counsel and refused to accept or acknowledge the written certification Sucharski had provided that he had no personal possession of confidential company files and that he would abide by his confidentiality obligations. Instead, HHK sent a letter to Sucharski on November 18, 2022—approximately 12 hours after his request and certification—referring to the fact that Sucharski had not signed the "Intellectual Property Acknowledgement" and notifying him that his employment was terminated "effective immediately."

While HHK's pattern of retaliatory conduct against Sucharski culminated in his unlawful termination that day, the retaliation and HHK's vendetta have continued. On November 30, 2022—a week after the formation of Saje Aerospace,

Inc. by Sucharski and his wife, Janeen Sucharski—HHK created a new HHK LinkedIn company page and then published a false and defamatory post on LinkedIn. The post was entitled "Termination of Company President Steve Sucharski," and it tagged Sucharski and included a variety of broad industry-related tags so that it would not only be picked up among Sucharski's 1,500+ connections and followers on LinkedIn and other social media (including a large swathe of contacts across the aerospace and defense industries) but also all others worldwide who searched for content with those industry tags. HHK also then blocked Sucharski from viewing the post and the feedback activity it received. HHK's motive and expectation was to impair the ability for Sucharski to operate and engage in any business within the industry, and to seek new employment in the industry (as other HHK employees confirmed Nepola had hoped), including through his new company, through this false and inflammatory post. Among other falsehoods, HHK's defamatory LinkedIn post falsely stated that Sucharski had "refused to sign" the "Intellectual Property Acknowledgement" (and was the "only" person to do so), that Sucharski "may have already shared proprietary information outside the Company," that Sucharski "may intend to improperly use proprietary information and documents," all despite the fact that Sucharski had already attested that he had not done so and would not do so and despite the fact that Sucharski simply asked for time to consult with his legal counsel regarding the document. HHK drafted and

widely published that libelous post maliciously and intending to interfere with Saje's coming launch and operations—even if not competitive with HHK's business—and as part of a concerted effort to induce customers not to approve Saje as a supplier or work with Sucharski or Saje, resulting in a direct financial impact to Saje as a new market entrant. HHK has maintained that defamatory post and made others through media and to customers, as it continues to interfere with Saje's business and to malign Sucharski and Saje to prevent Saje from establishing business relationships with significant aerospace customers and from establishing the substantial revenue stream approved supplier status would provide to Saje.

Sucharski and Saje have asserted the Amended Counterclaims to remedy the harm caused by HHK's unlawful conduct. In response, HHK has moved to dismiss the Amended Counterclaims. As to Sucharski's CEPA claims, HHK asking this Court to disregard the highly detailed allegations set out in the Amended Complaint and to impose pleading requirements that do not exist under federal law or CEPA. As to Sucharski's and Saje's libel claims, HHK argues that Sucharski and Saje have not pleaded special damages. As set out more fully below, Sucharski and Saje have, through their Amended Counterclaims, adequately, and specifically, pleaded more than is required to state a CEPA claim arising out of HHK's 4-month pattern of retaliation against Sucharski and all that is required of a new market entrant at this stage of litigation to state a claim for defamation. The Court should, therefore, deny

HHK's Motion so the parties can proceed with the discovery and truth HHK is desperately attempting to delay and conceal through its Motion to Dismiss.

## II.    <u>FACTUAL BACKGROUND</u>

### A.    HHK's Business and the Aerospace Fastener Industry

HHK is a New Jersey corporation headquartered in Paterson, New Jersey that manufactures certain latches and clamps, generally referred to as fasteners, for certain commercial and government/military aerospace customers as one of many non-exclusive outsourced manufacturers for such customers. (Am. Counterclaim (hereinafter "Am. CC") at ¶ 5.) HHK is a relatively small-sized supplier within the aerospace fasteners industry competing with many larger companies. (*See id.* ¶ 6.)

The fasteners manufactured by HHK and its competitors are sold into the production stream and distribution supply chain, and ultimately used by aerospace companies in the construction of aerospace systems and assemblies that are eventually used in the final assembly of aircrafts or rotorcrafts. (*Id.* ¶ 7.) HHK manufactures the fasteners it produces to each customer's proprietary "OEM Standards & Specs." (*Id.* ¶ 10.) The OEM customers require HHK to adhere to strict standards and performance requirements. (*Id.* ¶ 12.) HHK is ultimately required to certify in writing that the product is compliant with the customers' requirements and specifications. (*Id.*) Adhering to the customers' requirements and specifications requires the correct processes and equipment be used during production, passivation,

and furnishing, and all tools needed to conduct any inspections and to support the ultimate certification must be available and properly calibrated. (*Id.*) Should HHK fail to meet customer requirements, but falsely certify the product as compliant, it would be deceptive to the customer, would pose a serious safety risk to the users of the aircraft in which the parts are installed with other systems, and, if the customer is the federal government, would constitute a false claim to the government. (*Id.*) It is, therefore, vital that HHK and all companies in the space maintain strict quality and safety standards and adhere to compliant processes and procedures.

Beyond customer specific requirements, the products HHK manufactures are highly regulated by the government and HHK itself is subject to non-government standards and accreditation required to design, manufacture, and sell these products within the industry. (*Id.* ¶ 18.) One certification, known as AS9100 certification, is essential for maintaining aerospace approvals, qualifications, and shipment authorities in the industry and to meet customer requirements. (*Id.* ¶ 19.) HHK underwent an AS1900 audit every year, and a more comprehensive "Recertification Audit" every three (3) years, which would cover, among other things, quality management systems and procedures. (*Id.* ¶ 20.)

**B.    SUCHARSKI'S BACKGROUND AND EMPLOYMENT AT HHK**

Sucharski graduated from Princeton University with a B.S.E. in Mechanical & Aerospace Engineering in 2006. (*Id.* ¶ 13.) Sucharski first joined HHK in July

2006 as a sales engineer and thereafter served in various positions until he was elevated to President of HHK in November 2021. (*Id.* ¶ 14.) Sucharski's role as President involved oversight of sales, business development, and customer relationships as well as oversight of the engineering manager in Fair Lawn, New Jersey and oversight of operations managers at both of HHK's manufacturing facilities in Paterson, New Jersey and Richmond, Virginia, who were, in turn, responsible for the day-to-day site operations, quality control, production, purchasing/supply relationships, and facilities management. (*Id.* ¶ 15.) As President, Sucharski reported directly to HHK's owner, Nepola, and Nepola was directly involved with nearly all aspects of HHK's business. (*Id.* ¶¶ 15-16.)

### C. SUCHARSKI OBJECTS AND REFUSES NEPOLA'S UNLAWFUL DEMANDS

In the spring of 2022, HHK was scheduled to undergo its AS9100 Recertification Audit (the "Audit"), however HHK delayed the Audit until June 2022. (*Id.* ¶¶ 21-22.) Since the previous annual audit in 2021, HHK's top quality manager had resigned, and Nepola did not permit Sucharski or either of HHK's site managers to timely hire a qualified replacement quality manager until March 2022. (*Id.* ¶¶ 21-22.) At all material times, Nepola was generally not receptive to concerns raised by Sucharski and the site managers regarding HHK's lack of resources and quality control lapses, and would simply tell them to "take care of it." (*Id.* ¶ 23.) Rather than address those matters, Nepola instructed Sucharski and the HHK site

managers to cover quality issues with questionable reporting and staging of documentation in an attempt to pass the AS9100 Recertification Audit without actually addressing the issues or providing adequate resources to maintain an AS9100-compliant management system. (*Id.*)

In one particular instance relevant to Sucharski's counterclaim, Kennedy—site manager for HHK's Virginia facility—expressed deep concerns to Sucharski in response to Nepola's demands, even promising to alert the AS9100 auditor or other regulatory authorities if Nepola continued to pressure employees to engage in questionable reporting and conduct during audits related to calibration, special process compliance, and product traceability. (*Id.* ¶ 24.) Specifically, in early 2022, Nepola demanded that the Virginia facility get its passivation tank and associated infrastructure (*i.e.*, functional facility ventilation for the nitric acid, eye wash stations, coated flooring for acid environments, PPE) operational in short order. (*See id.* ¶ 25.) Kennedy refused to cut corners as demanded by Nepola. (*Id.* ¶ 26.) Doing so would require that the Virginia facility bypass steps, processes, and resources needed to set up the passivation tank in a manner compliant with the aerospace specifications and with regard to employee safety, and without the proper testing and inspection of the tank, any certification of products that went through the tank would be false. (*Id.* ¶¶ 26-27.) Sucharski relayed Kennedy's refusal to cut corners and the reasons why to Nepola, including concerns about certifying products to customers,

including the federal government, and concerns about ensuring the products were safely manufactured and safe for their intended aerospace use. (*Id.* ¶ 27.) Nepola was furious that Kennedy was unwilling to comply with his demands to disregard safety issues and compliance with OSHA standards and process conformity and instructed Sucharski to fire Kennedy, but Sucharski rebuffed Nepola and refused to fire Kennedy due to Kennedy's refusal to cut corners given the ethical and legal risks involved. (*Id.*)

As the Audit neared, Nepola maintained his demand to terminate Kennedy and also demanded Sucharski terminate Provost or, at a minimum, prevent or restrict their involvement in the Audit because of Nepola's concerns about what they would reveal to the auditors. (*Id.* ¶ 28.) Again, Sucharski refused to comply with Nepola's demand because he believed that it was an obvious attempt to mask the quality and safety problems Sucharski and others had repeatedly pointed out to Nepola. (*Id.*)

The June 2022 Audit went forward and ultimately identified 15 major areas of concern that needed to be addressed by HHK immediately in order to maintain AS9100 certification. (*Id.* ¶ 29.) One of the most serious findings concerned AS9100 Sections 5.1.1 and 7.1.1, which relate directly to the types of concerns Sucharski and Kennedy had raised with Nepola as critical needs and as reasons why corner-cutting could not be done with respect to the passivation tank at HHK's Virginia facility. (*Id.* ¶ 30.) In August 2022, HHK's AS9100 certification was suspended. (*Id.* ¶ 32.)

The AS9100 certification suspension was the result of Nepola's failure to address promptly and contain the identified corrective actions, including massive resource gaps at HHK and failure to immediately provide the necessary resources to address the findings of the Audit. (*Id.* ¶ 33.) Nepola's unlawful demands to Sucharski and others would not have prevented the outcome of the Audit and would have, in addition to creating legal risks, further doomed the Audit. (*Id.*)

### D. HHK RETALIATES AGAINST SUCHARSKI

On July 6, 2022, Sucharski was visiting the Virginia facility to plan actions to contain and address the Audit's areas of concerns. (*Id.* ¶ 35.) Around the same time, HHK appointed Roberts, a Florida-based lawyer, as "General Counsel" for HHK and as a director on HHK's newly formed Board of Directors, despite the fact that Roberts had no relevant industry background. (*Id.*) Before Sucharski could even meet with the management team during that visit, Roberts announced to all HHK employees, via Webex, a sudden and complete reorganization of HHK, starting with Sucharski's immediate removal as President and the installment of individual "Presidents" for each of HHK's operational bases. (*Id.* ¶ 36.) Slobodan Mladjenovic (who had been HHK's New Jersey site manager) was appointed as "President" of HHK's New Jersey operations, and Derek George (who had been employed by HHK for just 1 month at the time ***and who had no relevant aerospace fastener/hardware experience***) was appointed as "President" of HHK's Virginia operations. (*Id.*)

Shortly afterwards, George terminated Kennedy, effectuating the retaliation against him demanded by Nepola for months but which Sucharski had object to and refused. (*Id.*) Mladjenovic, in turn, terminated Provost, effectuating the retaliation against him demanded by Nepola and which Sucharski had objected to and refused. (*Id.*)

Through the reorganization, HHK reassigned Sucharski to a distinct line of business set up in June 2022 to supply after-market, spare products to customers in the commercial aerospace industry. (*Id.* ¶ 37.) The new line of business was placed under the trade name Aeginas Air LLC, which Roberts had just formed in Florida. (*Id.*) HHK dedicated no resources to Aeginas and left Sucharski isolated from HHK's main operations. (*Id.*) HHK further demanded that Sucharski move from his office in Fair Lawn, New Jersey to an "office" in Jupiter, Florida. (*Id.* ¶ 41.) During Sucharski's only visit to the Florida "office" in September 2022, Roberts threatened Sucharski at a lunch meeting at Carmine's La Trattoria Restaurant Palm Beach Gardens on September 8 that the brand new "business" would need to make money (or at least cover Sucharski's salary) by January 2023 or else Sucharski would be terminated by HHK. (*Id.* ¶ 42.) Despite that threat, HHK never provided Sucharski any dedicated resources to develop, plan, build out, and manage Aeginas' purported line of business, and Nepola avoided Sucharski's attempts to discuss Aeginas' business in August, September, and October 2022. (*Id.* ¶ 43.)

Then, on November 11, 2022, Sucharski received a document titled

"Intellectual Property Acknowledgment" (the "IP Acknowledgement"), which Roberts demanded Sucharski sign by the end of the day under the threat of termination. (*Id.* ¶ 44.) This was the first agreement of any kind that Sucharski was ever asked to sign in his 16 years of employment at HHK. (*Id.*) The IP Acknowledgement purported to address concerns from HHK's customers' "legal departments that [HHK] may be held legally responsible for any Intellectual Property of theirs, notably their blueprints, and any misuse of that property which may result from our custody of those blueprints and other proprietary information." (*Id.* ¶ 45.) But it defined Intellectual Property to include "all blueprints and other proprietary intellectual property" owned by HHK or held by HHK on behalf of other entities. (*Id.*) The IP Acknowledgement did not define what "other proprietary intellectual property" meant, and appeared to Sucharski to falsely imply that HHK's customers' information was HHK's information. (*Id.*) Worse still, the IP Acknowledgement sought indemnification from Sucharski for "any and all legal costs and fees that [HHK] may incur in association with [Sucharski's] intentional use of IP outside the scope of [Sucharski's] employment [ ] under any circumstances that is not authorized in writing prior to the use by a lawful representative of [HHK]." (*Id.* ¶ 46.) The IP Acknowledgement also required Sucharski to certify that he did not have possession of any "IP" other than within his workspace or HHK computer and specified that Sucharski must return or destroy any IP that he had access to

within 48 hours of termination of employment from HHK. (*Id.*) Significantly, the IP Acknowledgement omitted the mandatory notice required by the Defend Trade Secrets Act immunizing employees for and permitting retention or disclosure of information in connection with protected employee activities, including retaliation claims or for whistleblowing activities. (*Id.* ¶ 47.)

Given the breadth of the IP Acknowledgement, the timing of its presentation to Sucharski, the threat of termination, and the ongoing pattern of retaliation and intimidation, Sucharski raised concerns to HHK that HHK appeared to be setting up employees to take the blame for HHK's own failures and misconduct. (*Id.* ¶ 49.) And when Sucharski asked Nepola and Roberts the origin and purpose of the IP Acknowledgement, they responded that Boeing had requested HHK create the agreement, but they could not provide any documentation supporting that supposed reason. (*Id.*) Due to Sucharski's concerns about the IP Acknowledgement, about Nepola's conduct in connection with the Audit, about the recent retaliatory terminations of Provost and Kennedy, about Sucharski's objections to and refusal to comply with Nepola's unlawful demands, and about the demotion and pretextual reassignment and recent threats to Sucharski's employment with HHK, Sucharski requested of HHK an opportunity to consult with legal counsel. (*Id.* ¶ 50.) Nepola and Roberts responded angrily to Sucharski's request and demanded Sucharski sign the agreement immediately. (*Id.* ¶ 51.)

On November 17, 2022, Sucharski emailed Nepola and Roberts, stating that his legal counsel was reviewing the IP Acknowledgement and certifying that he did not "have any copies of Ho-Ho-Kus, Inc. blueprints or drawings (or similar documents) in hard copy form nor do I have any in electronic form outside my workspace and that I will not retain/take any such documents with me in the event that I leave for any reason." (*Id.* ¶ 52.) Rather than accommodate Sucharski's request to consult with counsel or acknowledge the certification he had just provided, HHK informed Sucharski on November 18, 2022—approximately 12 hours after his November 17 email—that he was terminated effective immediately. (*Id.* ¶ 53.)

### E.    SUCHARSKI RETAINED NO HHK PROPERTY OR INFORMATION

At the time of Sucharski's termination on November 18, 2022, he had, in addition to certifying he had no personal possession of HHK materials, already returned his HHK desktop to HHK in connection with the transition of his responsibilities during the reorganization and only had his HHK laptop with him (with no connection to HHK's servers). (*Id.* ¶¶ 55-56.) Sucharski thus disconnected his email on the HHK laptop (but not on HHK's email server), and he reset the laptop to factory settings, consistent with HHK's historical practice of resetting laptops returned by separating employees and allowing the devices to be put back into circulation "clean." (*Id.* ¶ 55.) That day, Sucharski informed Mladjenovic he had reset the laptop, and Mladjenovic raised no objection. Sucharski promptly set up a

meeting to return the laptop outside company premises, and upon its return, Mladjenovic informed Sucharski nothing more was needed. (*Id.* ¶¶ 55-56.)

At no point in time since the unlawful termination of Sucharski's employment on November 18, 2022, and the resetting of his HHK laptop has Sucharski accessed or had access to any confidential or proprietary HHK information or the ability to use or disclose any such information. (*Id.* ¶ 59.)

**F.    HHK Continues to Retaliate Against Sucharski and Defames Sucharski and Saje Just as Saje Plans to Launch**

After exploring opportunities in the industry following his termination from HHK on November 18, 2022, Sucharski and his wife, Janeen Sucharski, took steps to form Saje, using only their personal resources. (*Id.* ¶ 65.)

At the time of HHK's filing of this lawsuit, Saje focused only on the development and planning for manufacturing of NAS77 bushings and other similar NAS standard bushings for sale to aerospace customers that would be sold after it obtained AS9100 qualification (which did not happen until August 2023). (*Id.* ¶ 72.) Bushings are "open bid, open source" and deliverable by any AS9100-qualified organization, and they are not even products manufactured or solicited by HHK. (*Id.*) Like other parts, bushing specifications are publicly available and easily found on the Internet through Google or Global HIS or available for purchase on eBay. (*Id.*)

Neither Sucharski nor Saje has used any HHK or HHK customer confidential or proprietary information in connection with Saje's businesses, nor is such

information needed for Sucharski to pursue a career using his B.S.E. in Aerospace & Mechanical Engineering and to develop and operate a business such as Saje. (*Id.* ¶ 73.) Despite this, and despite the fact that Saje does not manufacture the same products as HHK, HHK has falsely stated verbally and in writing to aerospace customers that Saje has misappropriated HHK's information, that Saje competes with HHK, and that Saje is incapable of manufacturing parts for the aerospace and defense industries. (*Id.* ¶ 87.) HHK made these defamatory statements to customers (including Boeing Global Services and Boeing Distribution Services, Inc.), causing disruption with Saje's vendor status and with Saje's ability to pursue non-competitive business opportunities with those customers at the very time when Saje was attempting to launch its non-competitive business. (*Id.* ¶ 89.)

Specifically, on November 30, 2022—a week after the formation of Saje—HHK published a false, defamatory post on LinkedIn entitled "Termination of Company President Steve Sucharski." (*Id.* ¶ 60.) That post, set out fully below, tagged Sucharski and included a variety of broad industry-related tags so that it would not only be picked up among Sucharski's over 1,500 connections and followers on LinkedIn and other social media (including a large swathe of contacts across the aerospace and defense industries) but also all others worldwide who searched for content with those industry tags, and it was plainly intended to impair the ability for Sucharski to operate and engage in ***any*** business within the industry,

including through his and his wife's new company, Saje:

> Ho-Ho-Kus, Inc.'s stockholders and Directors terminated Steve Sucharski as President of the Company on July 6, 2022 due to their lack of confidence in his ability to guide the Company forward. Steve Sucharski was retained as an employee with the expectation that he would be placed in a more suitable position.

> Effective November 18, 2022, Steve Sucharski is no longer employed by nor otherwise affiliated with Ho-Ho-Kus, Inc. Earlier this month, the Company circulated a memorandum to all salaried employees, including Steve Sucharski, reminding them of their obligations to protect and maintain the confidentiality of all intellectual property owned by or entrusted to Ho-Ho-Kus, Inc. All salaried employees were directed to acknowledge receipt of the memorandum by signing a copy. All employees receiving the memorandum, except Steve Sucharski, returned signed copies. Steve Sucharski acknowledged receipt of the memorandum but refused to sign it, suggesting that he may or may have already shared proprietary information outside the Company. Subsequent interactions with Steve Sucharski have raised concerns that he may intend to improperly use proprietary information and documents.

> Ho-Ho-Kus, Inc. has developed a great deal of confidential and proprietary information and intellectual property. The Company has also been entrusted with proprietary material from its customers. Ho-Ho-Kus, Inc. has a legal right to protect its own intellectual property and trade secrets as well as a legal obligation to protect proprietary information provided to it by others.

> As President of Ho-Ho-Kus, Inc., Steve Sucharski was the ultimate custodian of all intellectual property owned by and in the care of the Company. Ho-Ho-Kus, Inc. cannot risk its former President potentially using Company and clients' trade secrets and documents in an improper manner that may be harmful to the Company, customers, and associates. Accordingly, Steve Sucharski was terminated as an employee of Ho-Ho-Kus, Inc., effective November 18, 2022.

> Effective July 6, 2022, Slobodan Mladjenovic was appointed President of Ho-Ho-Kus, Inc. Clamping Systems and Derek George was appointed President of Latch Systems.

(*Id.*) Since then, HHK has repeated those and similar falsehoods in the press

19

(including quotations in published Law360 articles) and the industry and to customers, including Boeing Global Services and Boeing Distribution Services, Inc., in an attempt to interfere with Saje's business and customers and to inhibit Saje from establishing a revenue stream. (*Id.* ¶ 89.)

## III. <u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure Rule 12(b)(6), a complaint may be dismissed "if it fails to state a claim upon which relief can be granted." *Jones v. Pi Kappa Alpha Int'l Fraternity*, Inc., 431 F. Supp. 3d 518, 523 (D.N.J. 2019). "The defendant, as the moving party, bears the burden of showing that no claim has been stated." *Id.* at 523-24 (citing *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011)). And the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 n.3 (3d Cir. 2014) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). In doing so, the Court may consider documents relied upon and referenced in the complaint or attached thereto. *See, e.g.*, *Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548, 560 (3d Cir. 2002).

A complaint "does not need detailed factual allegations," rather the factual allegations must merely "raise a right to relief above the speculative level," *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and state a "plausible claim for relief," *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3rd Cir. 2009). The Supreme Court has made clear that this basic pleading standard "does not impose a probability requirement." *Twombly*, 550 U.S. at 556. To the contrary, "[a] claim has 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Chadwick v. St. James Smokehouse, Inc.*, No. 14-2708, 2015 WL 1399121, at *8 (D.N.J. Mar. 26, 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## IV.  ARGUMENT

### A.  SUCHARSKI HAS STATED A CLAIM UNDER CEPA.

New Jersey's Conscientious Employee Protection Act ("CEPA"), prohibits employers from taking "*any* retaliatory action against an employee because the employee does *any* of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:

   1)  is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee . . . ; or

   2)  is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee . . . ; . . .

  c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

   1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee . . . ;

   2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee . . . ; or

   3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J. Stat. Ann. § 34:19-3 (emphasis added).

In the context of a motion to dismiss, in particular, it is notable that New Jersey courts have "long recognized that CEPA is remedial legislation and therefore 'should be construed liberally to effectuate its important social goal.'" *Dzwonar v. McDevitt*, 828 A.2d 893, 901 (N.J. 2003) (quoting *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994)). CEPA is also broader in scope than the wrongful termination principles under New Jersey common law preceding it. *Young v. Schering Corp.*, 645 A.2d 1238, 1245 (N.J. Super. Ct. App. Div. 1994).

To state a cause of action under CEPA, a plaintiff must plausibly plead only that: (1) he reasonably believed that his employer's conduct was violating a law, rule, or regulation or a clear mandate of public policy concerning the public health or safety; (2) he engaged in protected activity described in N.J.S.A. 34:19–3; (3) the

employer took an adverse employment action against him; and (4) a causal connection exists between the protected activity and the adverse employment action. *Dzwonar*, 828 A.2d at 900. Sucharski has met and exceeded those requirements, and his detailed allegations in the Amended Counterclaims must be accepted as true.

1.   **Sucharski Has Alleged His Reasonable Belief that HHK's Demands and Were Unlawful and Deceptive.**

The first element of a CEPA claim does not require a plaintiff to plead (let alone ultimately prove) that an employer actually violated the law. A plaintiff need only plead facts that could support his "reasonable belief that a violation has occurred." *Id.* at 901. After all, "[t]he goal of CEPA . . . is 'not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare.'" *Id.* (quoting *Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1015–16 (N.J. 1998)). "Accordingly, so long as [a p]laintiff has alleged that he believed the suggested action to be illegal, and so long as the Court finds a law to which the complained-of conduct is tied, the Complaint will pass 12(b)(6) muster on the first element of the CEPA claim." *Robert v. Autopart Int'l*, No. 14-CV-07266, 2015 WL 4031740, at *3 (D.N.J. June 30, 2015). Notably, whether a CEPA plaintiff's belief is reasonable "is a question reserved for the finder of fact," not a matter to be adjudged by the Court in a motion to dismiss. *Id.* Furthermore, a plaintiff who proceeds under Section c(3) regarding

public policy, as Sucharski does here, need not even show that he believed the conduct violated a law. To the contrary, a plaintiff need only show the conduct was "'*incompatible'* with a clear mandate of public policy expressed in a law, rule or regulation." *Maimone v. Atl. City*, 903 A.2d 1055, 1061 (N.J. 2006) (emphasis added).

Here, Sucharski has sufficiently and expressly pleaded that he believed Nepola's demands were unlawful, deceptive, and incompatible with public policy.

### a)    Unlawful Demands to Adopt Unlawful, Deceptive, and Unsafe Compliance and Inspection Practices.

First, Sucharski sufficiently pleads that he believed HHK's failure to meet quality control standards and Nepola's demands to bypass compliance requirements and cover-up quality issues with questionable reporting and staging of documentation was deceptive, risked violations of the False Claims Act, and presented a significant risk to employee and public safety—a bedrock public policy, particularly in the context of the aerospace industry and military operations.

The Amended Counterclaim alleges that HHK was required to certify in writing to customers that the products it manufactured complied with customer specifications. (Am. CC at ¶ 12.) Specifically, in relation to Nepola's unlawful demands regarding the passivation tank at HHK's Virginia facility, such certification requirements require HHK use the "correct processes and equipment . . . during production, passivation, and finishing." (*Id.*) And because of Nepola's failure to

address quality concerns raised by Sucharski and the site managers, including the failure to timely replace the top quality manager, HHK could not accurately certify compliance with customer specifications, including if it were to have hastily begun operating the passivation tank in response to Nepola's demands. (*See id.* ¶¶ 21-23.) Simply put, by falsely certifying products were compliant without the necessary processes, equipment, infrastructure, and calibration in place to inspect and ensure the same, HHK would be deceiving customers, including the federal government.

As to Nepola's demands to fast-track the completion of the passivation tank at the Virginia facility, more specifically, complying with those demands would have, as set out in the Amended Counterclaims, resulted in HHK's "inability to inspect and test passivated products correctly and with calibrated equipment, and the ultimate need to certify that such products met the requirements and specifications of the customers' orders, including those of the federal government" and any certifications made would have been deceptive to customers and false. (*Id.* ¶ 27.)

Those and other requirements and specifications are contractual obligations. The failure to abide by them and the false certification that those specifications have been met and inspected to have been met would constitute an obvious breach of those contracts, creating liability for breach of contract. To the extent those certifications were made to the U.S. government or to government contractors for the U.S. government—as they would have been given the types of latches that would

have been passivated at the Virginia facility—the false certifications would also constitute a false claim under the False Claims Act, 31 U.S.C. § 3729. Manufacturers who supply parts to the U.S. government and government contractors have been investigated and charged by the U.S. Department of Justice repeatedly for such unlawful conduct, as noted in the Amended Counterclaim.[1]

HHK's attempt, through its Motion to Dismiss, to paint Sucharski's allegations regarding false certifications as speculative is both wrong and misses the point entirely. (Mot. at 15.) While the Amended Counterclaim initially notes that a false certification to a customer is "potentially a false claim to the government if the government is the customer," (Am. CC at ¶ 12), Sucharski's claim is predicated on his objection to and refusal to abide by Nepola's unlawful demands "to cut corners or to falsely certify the inspection or conformity of products to customer requirements and specifications," specifically including Nepola's demand to fast-track the passivation tank at the Virginia facility. (*Id.* ¶¶ 76 (a)-(b), 79.) Had Sucharski and his reports not refused to comply with Nepola's demands, they would

---

[1] (*See, e.g.*, Am. CC at ¶ 79 (citing https://www.justice.gov/opa/pr/aircraft-parts-foundry-agrees-settle-false-claims-act-allegations-failure-conduct-testing-and ($500,000 settlement for helicopter part manufacturer that supplied defense contractors and falsely certified testing) and https://www.justice.gov/usao-cdca/pr/aerospace-parts-manufacturer-pays-27-million-settle-lawsuit-alleging-it-failed-perform ($2.7 million settlement for aerospace fastener manufacturer that supplied defense contractors and falsely certified inspections).) Government contracts for HHK parts requiring passivation are publicly available.

have (i) directly caused false certifications to government and government contractor customers to be made for any products passivated in that tank, all of which would then have been falsely certified as compliant with the manufacturer specifications; and (ii) falsely certified those products as having been properly inspected. The allegations thus go far beyond speculation "a law *might* someday be violated" and confirm the conduct at issue, if not objected to, would have resulted in a violation of law with significant legal repercussions to HHK. *Compare with Blackburn v. United Parcel Serv., Inc.*, 3 F. Supp. 2d 504 (D.N.J. 1998), *aff'd*, 179 F.3d 81 (3d Cir. 1999).

In addition, Nepola's demands to cut corners and the resultant failure to comply with customer requirements and certification of compliance with those requirements had significant safety implications not only for HHK's workers but also for the public, given the intended aerospace use of the products, including those that would have been passivated at HHK's Virginia facility were Sucharski and Kennedy to have complied with Nepola's unlawful demands. As pleaded in the Amended Counterclaims, passivation is a highly technical process using dangerous chemicals, and it serves a critical safety purpose to help promote anti-corrosion of the parts used in aircraft. (Am. CC at ¶ 2(b), n.2.) Failing to employ safe measures imperils safety in both regards, and Nepola's demands were, simply put, incompatible with the clear mandate of public policy concerning public safety in the aerospace industry, as confirmed and codified under federal law. *See, e.g.*, 49 U.S.C.

§ 44701(a)(1) (empowering the FAA Administrator to "promote safe flight of civil aircraft in air commerce by prescribing . . . minimum standards required in the interest of safety . . . for the design, material, construction, quality of work, and performance of aircraft."). Those standards and regulations extend to false statements regarding products used in manufacturing aircraft. *See* 14 C.F.R. § 3.5 (prohibiting "fraudulent or intentionally false statements" or "intentionally misleading statements" that a part is acceptable for installation on certain aircraft).

### b) Unlawful Demands to Retaliate Against Objectors.

In addition to Nepola's unlawful demands with respect to the passivation tank at the Virginia facility, the Amended Counterclaims adequately pleaded that Sucharski believed Nepola's demand to terminate and retaliate against his reports at the Virginia facility was also unlawful.

For instance, Sucharski openly refused to fire Kennedy as Nepola had repeatedly demanded. Sucharski specifically alleges in the Amended Counterclaims that Nepola "demanded that Sucharski fire Mr. Kennedy" because he "was unwilling to cut corners to meet Mr. Nepola's demands" to get the passivation tank at the Virgina facility operational. (Am. CC at ¶¶ 26-27.) As alleged, Kennedy specifically raised concerns that the fast-tracking of the passivation tank would require skipping safety tests that "would be needed to safely and lawfully set up and operate the passivation tank" and ultimately support certification of customer products,

including those for the federal government. (*Id.*) Kennedy also "promised to alert the auditor or other authorities" if Nepola continued to pressure employees to engage in conduct that would cut safety corners and deceive auditors and ultimately customers. (*Id.* ¶ 24.) Sucharski refused to terminate Kennedy in light of Sucharski's and Kennedy's objections and refusal to participate in conduct they believed was illegal, deceptive, and in contravention of public policy. (*Id.* ¶ 27.) Terminating Kennedy for voicing his objections to such conduct and for refusing to abide Nepola's unlawful demands, given the safety and legal risks those demands created, would have, in Sucharski's perspective, violated state and federal whistleblower protection laws. As detailed above, CEPA, for one, prohibits an employer from retaliating against an employee for, among other things, objecting to or refusing to participate in conduct that the employee believes is illegal, deceptive, or in contravention of public policy or one who has, as did Kennedy, (*id.* ¶ 24), threatened to disclose to a public body activity the employee believes is illegal. *See, e.g.*, N.J. Stat. Ann. § 34:19-3.

Those allegations, together with the allegations regarding Sucharski's refusal to terminate or otherwise retaliate against Provost, sufficiently plead facts plausibly showing that Nepola's demands for the retaliatory terminations implicated whistleblower violations, including under CEPA, further supporting Sucharski's CEPA claim. In its Motion to Dismiss, HHK argues that an objection to a CEPA

violation cannot be a basis for a CEPA violation, but it cites to no authority—nor could it. It is beyond dispute that an employee's refusal to violate CEPA in response to a demand by an officer or director such as Nepola to retaliate against a fellow employee may form the basis for a CEPA claim. CEPA expressly protects an employee who objects to or refuses to engage in conduct that "is in violation of *a law*," without limitation. N.J. Stat. Ann. § 34:19-3 (emphasis added). CEPA is undoubtedly "a law," and Sucharski's refusal to abide Nepola's unlawful demands to fire and retaliate against Kennedy, among others, for objecting to and refusing to abide by Nepola's unlawful demands was reasonable.

In addition to CEPA, Nepola's demand to terminate Kennedy after Kennedy commented that he would alert authorities if Nepola continued to pressure Sucharski, Kennedy, and others to cut safety corners and to deceive auditors or customers directly implicates 49 U.S.C. § 42121 (the "AIR21 Whistleblower Program"). The AIR21 Whistleblower Program, in part, prohibits a company that performs safety-sensitive functions by contract for an air carrier from retaliating if an employee threatens to report violations of FAA orders, regulations, or standards. *See* 49 U.S.C.A. § 42121. Nepola's demand that Sucharski terminate Kennedy following Kenney's statement about disclosing information to authorities directly implicates the AIR21 Whistleblower Program, and Sucharski's refusal to follow through that retaliatory termination and belief of its illegality were reasonable.

### c) Unlawful Demands as to the IP Acknowledgement and Denial of Right to Seek Counsel.

The Defend Trade Secrets Act of 2016 (the "DTSA"), mandates that an employer provide notice of whistleblower rights in "any contract or agreement with an employee that governs the use of a trade secret or other confidential information." 18 U.S.C. § 1833(b)(3)(A). In enacting the DTSA, Congress clearly stated a public policy of protecting the rights of employees, including whistleblowers.

Here, Sucharski objected to signing the IP Acknowledgment due what he believed to be to its apparent illegality and purpose of setting employees up to take the blame for HHK's own misconduct without consulting legal counsel. (*See, e.g.,* Am. CC at ¶¶ 49-52.) Contrary to the argument set out in HHK's Motion to Dismiss, Sucharski's objection to signing the unlawful IP Agreement clearly implicates the statutory mandate to protect whistleblowers as announced by Congress in the DTSA. The IP Acknowledgement's attempt to require Sucharski to indemnify HHK, including for its attorney's fees and costs, is also statutorily prohibited under the DTSA (in other words, illegal) as a direct result of HHK's failure to contractually recognize Sucharski's rights report on possible violations of the law. Objecting to HHK's demands to sign the illegal IP Acknowledgement under threat of termination is, therefore, a refusal to abide an illegal demand, and is protected under CEPA. The IP Acknowledgement also purported to place ownership of third-party information in HHK, which Sucharski reasonably believed to be not only untrue but illegal.

31

Compounding the illegality of the IP Acknowledgement, Nepola and Roberts refused to permit Sucharski to consult with his legal counsel, as specifically requested and as is his foundational right. Indeed, HHK terminated Sucharski just hours after attempting to exercise that right. There can be no dispute that there is a foundational public policy of an employee's right to consult with counsel generally and, more specifically, in the context of a potential whistleblower and in the face of ongoing retaliatory conduct. The DTSA confirms that policy in requiring that employers such as HHK expressly notify employees of their rights in that regard. Not only did HHK fail to provide that notice, but it also retaliated against Sucharski for attempting to exercise those very rights.

Sucharski's assertion of his rights and concerns regarding the IP Acknowledgement were, therefore, plainly rooted in his reasonable belief of the IP Acknowledgement's illegality and of his right to consult with counsel.

## 2. **Sucharski Has Plausibly and Expressly Pleaded His Engagement in Protected Activity Under CEPA.**

Sucharski has sufficiently pleaded that he believed Nepola's demands and retaliatory conduct violated the law, contradicted public policy, and would have constituted, at minimum, deception as to customers, and he has sufficiently pleaded that he objected to and refused to abide those unlawful demands and was retaliated against for it by Nepola—the top executive at HHK, and the one whose demands he had objected to and refused to comply with. That is all that is required to be pleaded.

The second prong of CEPA merely requires a plaintiff allege facts showing he "performed a 'whistle-blowing' activity, which occurs when an employee 'discloses . . . to a supervisor . . . an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law' **or** 'objects to . . . any activity, policy or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law.'" Henson v. Daimler Truck N. Am. LLC, No. 22-CV-6479, 2023 WL 3072532, at *6 (D.N.J. Apr. 25, 2023) (quoting N.J. Stat. Ann. §§ 34:19-3(a)(1), (c)(1)) (emphasis added). In other words, "CEPA not only protects an employee who discloses or threatens to disclose alleged wrongdoing to a supervisor, *but also protects an employee who merely 'objects to, or refuses to participate in' an employer's activity which the employee 'reasonably believes' violates law or a clear mandate of public policy*." *Young*, 645 A.2d at 1245 (emphasis added), quoted in *Stapleton v. DSW, Inc.*, 931 F. Supp. 2d 635, 638 (D.N.J. 2013) ("[I]n order to be protected against retaliatory action by his employer, the employee 'need not actually make a report to anyone, but can simply refrain from acting and still be protected by CEPA.'").

Here, Sucharski has specifically alleged that he *both* reported his and his reports' objections directly to Nepola *and* refused to abide by Nepola's demands to fire and otherwise retaliate against Kennedy and others and to get the passivation tank at the Virginia facility operational without necessary safeguards and protocols

to ensure compliance with customers' requirements.

Sucharski pleads that, "[u]pon his return to New Jersey, Mr. Nepola spoke with Sucharski and was furious that Mr. Kennedy was not willing or able to get the passivation tank at the Virginia facility operational, and Mr. Nepola demanded that Sucharski fire Mr. Kennedy" and that Sucharski "refused to fire Mr. Kennedy for his unwillingness to cut corners in making the passivation tank at the Virginia facility operational, given the ethical and legal risks involved, the inability to inspect and test passivated products correctly and with calibrated equipment, and the ultimate need to certify that such products met the requirements and specifications of the customers' orders, including those of the federal government." (*Id.* ¶ 27.)

Sucharski likewise has pleaded that he objected directly to Nepola and Roberts about the IP Acknowledgement and asserted to them directly his request for an opportunity to consult with legal counsel before turning a signed copy of the IP Acknowledgement. (*Id.* ¶¶ 49-52.)

Nothing more is required at this stage, particularly where Sucharski's allegations are to be accepted as true, and there is certainly nothing in CEPA or otherwise that requires an employee who is being retaliated against to cite a specific law he believes is being violated to his employer or the retaliating party, as HHK seems to argue in its Motion to Dismiss, (*see* Mot. at 12, 19). All CEPA requires is that the employee reasonably believes the demands or practices are unlawful and

that he was retaliated against for refusing to abide them or for alerting authorities.

Sucharski has adequately pleaded that he engaged in protected conduct, and HHK's attempt to graft onto CEPA an obligation that not only does not exist but that would essentially "make a lawyer" out of an employee such as Sucharski has no legal basis. *See Dzwonar*, 828 A.2d at 901. As New Jersey courts have observed:

> CEPA does not require any magic words in communicating an employee's reasonable belief of illegal activity. The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful. . . . It is not necessary for CEPA plaintiffs to show that a law, rule, regulation or clear mandate of public policy would, in fact, be violated if all that the employee discloses were true. The complaining employee need not specifically articulate the "exact violation" that is occurring.

*Beasley v. Passaic Cnty.*, 873 A.2d 673, 684 (N.J. Super. Ct. App. Div. 2005) (collecting authority). And where, as here, a CEPA claim is based on a refusal to abide demands reasonably believed to be unlawful, notice to a supervisor is not even required, as a matter of law. *See, e.g.*, *Stapleton*, 931 F. Supp. 2d at 638; *Young*, 645 A.2d at 1245. The Court must, therefore, reject HHK's arguments to the contrary.

### 3. Sucharski Has Plausibly and Sufficiently Pleaded Causation.

Finally, to demonstrate causation for a CEPA claim, a plaintiff need not plead that the protected conduct was the only basis for the termination. A plaintiff need only show that the protected activity (*i.e.*, the objection to or refusal to abide by the demands) "was more likely than not a determinative factor in the decision." *Robles*

*v. U.S. Env't Universal Servs., Inc.*, 469 F. App'x 104, 107 (3d Cir. 2012) (quoting

*Donofry v. Autotote Sys., Inc.*, 795 A.2d 260, 271 (N.J. Super. Ct. App. Div. 2001)).

New Jersey courts recognize that "[r]etaliation may be reasonably inferred from the

circumstances surrounding the employment action, including temporal proximity

between the protected activity and the adverse action." *Robles*, 479 F. App'x at 107

(citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000))

(citation and quotation omitted). Here, Sucharski has adequately pleaded causation

for multiple reasons, and his detailed allegations must be accepted as true.

First, Sucharski has pleaded the temporal proximity between his protected

conduct and HHK's retaliation against him as well as additional allegations showing

causation, including a specific pattern of retaliation, including retaliatory acts of

demotion, isolation and intimidation, silencing, and ultimately wrongful

termination, all tied back to a related series of events. As alleged in the Amended

Complaint, HHK's retaliation against Sucharski began in July 2022 when Sucharski

was demoted as President and pretextually reassigned to a dead-end line of business

where he was isolated from the rest of the company and silenced. (Am. CC at ¶¶ 35-

37.) And he was then presented with the IP Acknowledgement under threat of

termination as a further attempt to silence and intimidate him, in violation of law,

and terminated hours after asserting his right to consult with counsel. (*Id.* ¶¶ 50-53.)

It is that 4-month pattern of retaliation, culminating in his termination on November

18, 2022, just hours after he raised concerns about the IP Acknowledgement, that undergirds Sucharski's CEPA claim.

Even beyond the temporal proximity pleaded in the Amended Complaint, Sucharski has adequately pleaded that the retaliation was in direct response to his refusal to isolate and ultimately fire Kennedy and Provost in response to Nepola's demands, his objections to and refusal to abide Nepola's demands to cut corners in activating the passivation tank at the Virginia facility unsafely, without compliance with customers' manufacturing and finishing specifications, and with resulting false certifications of compliance, and his objections to Nepola's and Roberts' attempts to silence and intimidate him through the illegal IP Acknowledgement and in response to his request to consult with legal counsel. (*Id.* at ¶ 76.) Not only must this Court accept those allegations as true for purposes of the Motion to Dismiss, but Sucharski has also specifically pleaded that he was terminated in retaliation for not signing the IP Acknowledgement under duress—as even HHK's own termination letter indicates—and that immediately after HHK removed Sucharski as President, Kennedy and Provost were fired by Sucharski's replacements "effectuating the retaliation against Mr. Kennedy [and Mr. Provost] that Mr. Nepola had been demanding and to which Sucharski had objected," (*id.* ¶ 36). Those facts alone support an inference that Sucharski was retaliated against for not abiding by Nepola's illegal demands on those matters.

**B.   SUCHARSKI AND SAJE HAVE STATED CLAIMS FOR DEFAMATION.**

To state a claim for defamation under New Jersey law, a plaintiff "must allege: (1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 467 (D.N.J. 2020) (citing *Ross v. Bd. of Educ. Greater Egg Harbor Reg. High Sch. Dist.*, 658 F. App'x 97, 100 (3d Cir. 2016)).

Critically, "[a]t the motion to dismiss stage, the plaintiff need not identify the precise defamatory statements made by the defendant." *Id.* (citing *Mangan v. Corporate Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 204 (D.N.J. 2011). But Saje and Sucharski have specifically identified the alleged defamatory statements in their Amended Counterclaims, including HHK's defamatory LinkedIn post on November 18, 2022, falsely stating to a wide audience that Sucharski: (1) refused to sign the IP Acknowledgment, (2) shared proprietary information outside of HHK, and (3) intended to improperly use proprietary information and documents. (*See* Am. CC at ¶ 60.) Defendants additionally specifically allege that HHK made similar statements both verbally and in writing to aerospace customers, including to Boeing Global Services and/or Boeing Distribution Services, Inc., (*see id.* ¶ 89), including false statements that: (1) "Saje is competing with HHK", (2) "Saje is manufacturing the same products as HHK", (3) "Saje has misappropriated or otherwise used or

disclosed confidential and/or trade secret information belonging to HHK or HHK's customers", and (4) "Saje is not capable of manufacturing parts for the aerospace and defense industries," (*id.* ¶ 87).

As to the second element, Sucharski and Saje have sufficiently alleged that HHK knew or recklessly disregarded the falsity of these statements. Specifically, HHK knew from Sucharski's November 17, 2022, email that Sucharski did not "refuse" to sign the IP acknowledgment and that Sucharski had already specifically advised HHK in writing that he had not retained or shared any proprietary information outside of HHK. (*See id.* ¶ 52.) Further, HHK knew that Sucharski was not in possession of his HHK desktop computer since July 2022, and HHK knew that Sucharski had promptly returned his HHK laptop to Mladjenovic the same day he received his letter of termination. (*Id.* ¶¶ 55-56, 73-74.) Finally, Saje and Sucharski have sufficiently pleaded that HHK knew that Saje was not manufacturing competing products, yet have publicly said otherwise, and have falsely stated that Saje was incapable of manufacturing parts for customers. (*Id.* ¶ 72.) *Red Hawk, LLC*, 449 F. Supp. at 467 (denying motion to dismiss defamation claim based on statements that party could not perform services for customers).

Contrary to the arguments in HHK's Motion to Dismiss, Sucharski and Saje have also adequately pleaded special damages. Specifically, Defendants allege that HHK's defamatory statements "inhibited Saje's status as an approved supplier of

non-competing parts" with Boeing Global Services, Boeing Distribution Services, and other customers and potential customers, causing "a substantial loss of revenue to date." (*Id.* ¶ 90.) Having specifically identified at least one customer with which HHK has interfered through its defamatory statements, Sucharski and Saje have sufficiently alleged that HHK's statements have prevented Saje from gaining approved supplier status in the market. These allegations—including the specific reference to the Boeing entities—go far beyond general statements of damages and vague allegations of loss of goodwill, and, as a new market entrant and start up in the industry, it is not logical or reasonable, at this pleading stage, to require Saje to plead specific detail of financial losses in the same manner as an established enterprise. *Compare Floorgraphics, Inc. v. New Am. Mktg. In-Store Servs.*, Inc., No. CIV 04-3500 AET, 2006 WL 2846268 (D.N.J. Sept. 29, 2006) (denying motion to dismiss trade libel claim where plaintiff "names specific retailers and businesses that refused to deal with it or imposed extraordinary measures as a result of Defendant's conduct"), *with Sciore v. Phung*, No. CV 19-13775, 2022 WL 950261 (D.N.J. Mar. 30, 2022) (dismissing libel claim identifying "loss of particular customers").

## V.    <u>Conclusion</u>

Based on the reasons stated herein, the Court should deny HHK's Motion to Dismiss in its entirety.

Dated:  April 1, 2024

**BLANK ROME LLP**
*A Pennsylvania LLP*

*/s/ Stephen M. Orlofsky*

Stephen M. Orlofsky (NJ ID: 012431974)
New Jersey Resident Partners
Michael R. Darbee (NJ ID: 119682014)
300 Carnegie Center, Suite 220
Princeton, New Jersey 08540
Tel.: 609-750-2646
Fax: 609-897-7286
stephen.orlofsky@blankrome.com
michael.darbee@BlankRome.com
*Attorneys for Defendants*


Anthony B. Haller, Esq. (*pro hac vice*)
Kevin M. Passerini, Esq.
One Logan Square
130 N. 18th Street
Philadelphia, PA  19103
Phone: (215) 569-5500
Fax: (215) 569-5555
Anthony.Haller@BlankRome.com
Kevin.Passerini@BlankRome.com

## <u>CERTIFICATE OF SERVICE</u>

I, Kevin M. Passerini, certify that a true and correct copy of the foregoing was served on counsel of record by email, this 1st day of April, 2024.

/s/ *Kevin M. Passerini*
KEVIN M. PASSERINI