<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HO-HO-KUS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>STEVEN SUCHARSKI, JANEEN SUCHARSKI, and SAJE AEROSPACE, INC.,<br>    Defendants. | Case No. 2:23-cv-01677 (BRM) (JSA)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is a motion (ECF No. 52) by Plaintiff Ho-Ho-Kus, Inc. ("HHK") to dismiss Defendants Steven Sucharski's ("Sucharski") and Saje Aerospace, Inc.'s ("Saje") (together with Sucharski, "Defendants") Amended Counterclaims (ECF No. 47) pursuant to Federal Rule of Civil Procedure 12(b)(6). On April 16, 2024, Plaintiff's Motion to Dismiss Defendants' Amended Counterclaims was refiled[1] (the "Motion") (ECF No. 52), Defendants filed an opposition to the Motion (ECF No. 53), and HHK submitted its reply brief (ECF No. 54). Having reviewed the submissions filed in connection with the Motion and having declined to hold oral arguments pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good

---

[1] HHK originally moved to dismiss Defendants' Amended Counterclaims on February 26, 2024. (ECF No. 49.) The parties then filed a letter with the Court (ECF No. 50) in which they stipulated and agreed to a modification of the briefing schedule for the motion to dismiss to the following effect: (1) Defendants file opposition papers by April 1, 2024; (2) HHK files reply papers, if any, by April 15, 2024; and (3) a revised motion day of May 6, 2024, pursuant to Local Civil Rule 78. (*Id.* at 2.) Accordingly, the Court issued a Text Order (ECF No. 51) on March 13, 2024, adopting the modifications, directing the Clerk of Court to administratively terminate the motion, and ordering the parties to coordinate the electronic filing of the moving, opposition, and reply papers in three separate docket entries. (*Id.*)

cause having been shown, HHK's Motion to Dismiss Defendants' Amended Counterclaims (ECF No. 52) is **GRANTED**.

I.    BACKGROUND

The factual and procedural backgrounds of this matter are known to the parties and were previously recounted in great depth by the Court in its prior opinion granting in part and denying in part Defendants' Motion to Dismiss and denying HHK's application for a Preliminary Injunction and Temporary Restraining Order. (*See* ECF No. 39.) Accordingly, the Court will recount only the factual background and procedural history associated with this Motion.

**A.  Factual Background**

HHK is a New Jersey corporation founded in 1992 (Compl. (ECF No. 1) ¶¶ 8, 10) that designs and manufactures high precision parts and components for certain commercial and government/military customers based on detailed proprietary prints and models provided to the company (*id.* at ¶ 11; Am. Countercl. (ECF No. 47) at 26.) HHK uses these detailed prints and models, which are owned and provided by its customers to develop a unique design and manufacturing plan. (ECF No. 1 ¶ 13; ECF No. 47 at 27.) It also creates other confidential and propriety information for its business operations, including customer lists, pricing information, marketing materials and methods, pricing models, and sales data and projections (together with the manufacturing plan, the "Protected Information"). (ECF No. 1 ¶ 14.) HHK states it employs various methods to protect the secrecy of its proprietary information, including password protecting all electronic devices, restricting access to electronic and hard copy information to only those with a need to know, requiring visitors to sign an entry log, and requiring all employees to always wear company-issued identification badges while on the premises. (*Id.* at ¶ 16.) Moreover, HHK's Employee Handbook indicates that employees may not disclose any trade secrets or

confidential information, and employees exposed to confidential, sensitive, or proprietary information may be required to sign a trade secret and non-disclosure agreement. (*Id.* at ¶ 17.) The parties agree that there is no such non-compete or non-disclosure agreement between HHK and any defendant. (Oral Arg. Tr. (ECF No. 31) at 5:8–10.)

Sucharski served as General Manager and President of HHK from 2015 to 2022, during which time he oversaw all aspects of the business and was responsible for developing and safeguarding its proprietary information. (ECF No. 1 ¶¶ 22–23.) Specifically, Sucharski oversaw inside and outside sales, business development, and customer relationships as well as the engineering manager in Fair Lawn, New Jersey, and the on-site operations managers at HHK's Paterson, New Jersey—one Slobodan Mladjenovic ("Mladjenovic")—and Richmond, Virginia manufacturing facilities. (ECF No. 47 at 28.) The industry in which HHK operates is highly regulated, and manufacturers, including HHK, and others are "subject to non-government standards, certifications, and accreditation that is required . . . to design, manufacture, or sell parts of this nature." (*Id.* at 30.) During Sucharski's employment with HHK, owner and director, Tom Nepola ("Nepola"), was directly engaged in supporting, negotiating, and approving major customer and supplier contracts, exclusively oversaw the VP of Finance, and was involved in nearly all other aspects of HHK's business. (*Id.* at 29.) Throughout his time at HHK, Sucharski became concerned with allegedly unlawful and deceptive practices mandates by Nepola. (*Id.*) Nepola allegedly disregarded laws, standards, the regulatory regime and certain requirements needed to engage lawfully and safely in the industry and instead cut corners and shifted responsibility to others within HHK, which Sucharski and other employees witnessed. (*Id.*)

The aerospace manufacturing industry is a highly regulated one, and HHK and other competing manufacturers are subject to non-government standards, certifications, and

accreditation required to operate. (*Id.* at 29–30.) This regime is intended to promote "the clear public policy mandate of safety." (*Id.*) Principal among these required certifications is the AS9100 certification, the audit for which HHK underwent annually; a more comprehensive re-certification audit taking place every third year. (*Id.* at 30.) The recertification audits covered, among other things, quality management systems and procedures. In June 2022, HHK underwent a recertification audit (the "Recertification Audit") designed to ensure compliance with guidelines set forth by SAE International, the governing body that maintains aerospace approvals, qualifications and shipment authorities in the industry. (ECF No. 1 ¶ 21.) The last audit before to the June 2022 audit occurred one year prior in the Summer of 2021 and was followed soon thereafter by the resignation of HHK's top quality manager. (*Id.*) Nepola did not permit Sucharski or others to immediately hire a replacement quality manager and only approved a new hire in March 2022 after Sucharski and HHK's New Jersey and Virginia site operations managers "pleaded with [him]" to do so. (*Id.* ¶ 22.)

Nepola would instruct Sucharski and others, including Mladjenovic, to "take care of it" whenever they raised "concerns" regarding a lack of resources to adequately address HHK's quality management systems, often with dubious reporting and staging to pass an audit but without addressing the underlying issues or providing adequate resources to maintain an AS9100-compliant system. (ECF No. 47 at 30–31.) In one instance, HHK's Virginia site operations manager expressed deep concern to Sucharski regarding Nepola's requested course of action and promised to alert relevant authorities if Nepola continued to pressure employees to engage in questionable reporting and conduct during internal and external audits related to critical topics like calibration, special process compliance, and production traceability. (*Id.* at 31.) Sucharski and others had many concerns—which Nepola consistently disregarded—related to Nepola's "demands" in early 2022

4

for the Virginia facility to get its unused passivation tank "up and running[.]" (ECF No. 1 at ¶ 25–27.) In particular, Sucharski alleges Nepola demanded he and others "certify compliance with customers' requirements and specifications[,]" which, in actuality, "were either not met or were not able to be verified as having been met." (ECF No. 47 at 50.) Sucharski spoke with Nepola about Nepola's demands regarding the passivation tank ahead of a visit to HHK's Virginia facility in late March 2022, and Nepola told Sucharski to address those issues with the Virginia site operations manager. (*Id.* at 32.) The Virginia site operations manager, like Sucharski, was unwilling to cut corners to meet Nepola's demands and explained all the steps, processes, and resources that would be needed to safely and lawfully set up and operation the passivation tank as well as to support the production and ultimate certification of compliant products. (*Id.*) Sucharski spoke with Nepola after his return to New Jersey, who was furious that the Virginia site operations manager was not willing or able to get the passivation tank operational and demanded that Sucharski fire the manager, which Sucharski refused to do. (ECF No. 1 at ¶ 27.)

In the weeks before the 2022 Recertification Audit, Sucharski, along with Mladjenovic and the Virginia site operations manager, agreed to do the best they could with the limited time and resources available. (*Id.* at ¶ 28.) At the same time, Nepola continued to demand Sucharski terminate both Mladjenovic and the Virginia site operations manager before the Recertification Audit occurred or otherwise work to prevent or restrict their involvement in it because of Nepola's concerns regarding what they might reveal to the auditors. (ECF No. 47 at 32–33.) Sucharski refused to comply with Nepola's repeated demands to fire the two site operations managers. (*Id.*) The Recertification Audit identified fifteen areas of concern in the company's practices and procedures for immediate correction for HHK to maintain AS9100 certification. (*Id.* at 33.) In August 2022, HHK's AS9100 certification was suspended. (ECF No. 1 at ¶ 32.) One week after

the Recertification Audit, HHK announced a sudden and complete reorganization, beginning with Sucharski's immediate removal as President of HHK. (ECF No. 47 at 34.) Sucharski's position was broken up into individual presidents for each of HHK's operational bases, and Mladjenovic was promoted from New Jersey site operations manager to President of HHK's New Jersey operations. (ECF No. 1 at ¶ 36.) Moreover, Sucharski was reassigned responsibility for a distinct line of business established in June 2022 to supply after-market, spare products to customers in the commercial aerospace industry; HHK dedicated no resources to the new business. (*Id.* at ¶ 37.)

On November 11, 2022, HHK requested all employees and officers sign a document titled Intellectual Property Acknowledgement to verify in writing that they had not, and would not, misuse or disclose any Protected Information. (ECF No. 1 ¶ 29.) Sucharski did not sign because he felt it was unusual and an attempt to silence and intimidate him. (ECF No. 47 at 37.) Other HHK employees similarly did not sign the agreement. (*Id.* at 45.) The Intellectual Property Acknowledgement specified that it served to address concerned originating from HHK's customers' legal departments regarding how their intellectual property was being used but did not fully define the intellectual property in question implied HHK's customer's information belonged to HHK. *(Id.* at 37–38.) The Intellectual Property Acknowledgement also did not include a mandatory notice required by the Defend Trade Secrets Act, *see* 18 U.S.C. § 1833(b)(3)(A), immunizing employees for, and permitting retention or disclosure of, information related to protected employee activities, including whistleblowing activities. (*Id.* at 38.) Given his concerns regarding the Intellectual Property Acknowledgement as well as Nepola's allegedly unlawful and deceptive conduct in connection with the Recertification Audit, Sucharski contacted legal counsel, which angered Nepola who demanded Sucharski sign the agreement. (*Id.* at 39.) Sucharski did not refuse to sign the agreement but wrote an email in the evening of November 17, 2022, to Nepola

and an HHK attorney in which he stated he had contacted counsel regarding the agreement and emphasized he did not have any copies of HHK or customer intellectual property in his possession. (*Id.* at 40.)

HHK terminated Sucharski in a letter dated November 17, 2022, and electronically transmitted this letter to him at 6:00 a.m. on November 18, 2022. (ECF No. 1 ¶¶ 53–54.) On November 30, 2022, HHK published an allegedly defamatory post on LinkedIn entitled "Termination of Company President Steve Sucharski[,]" which cited a "lack of confidence" in his ability to perform as needed and stated that he "refused to sign" the Intellectual Property Acknowledgement; the LinkedIn Post only discussed Sucharski's termination and did not mention any other companies, including Saje, a company later incorporated by Sucharski and his wife. (ECF No. 47 at 43.) In addition to the LinkedIn Post, HHK also allegedly spread falsehoods about Saje in the press and to others within the industry. (*Id.* at 45.)

Later that month, on November 23, 2022, Sucharski and his wife[2] incorporated Saje in Connecticut, allegedly to design and manufacture the same products as HHK, with Sucharski as Saje's President and General Manager. (ECF No. 1 ¶ 35.) Saje's website advertises that its "experienced team can design and qualify complex systems[,]" can "meet our aerospace customers' complex and bespoke requirements[,]" and has a "production facility" with "state-of-the-art manufacturing equipment complemented by an advanced, on-site testing laboratory[.]" *(Id.* at ¶¶ 37–38.) Defendants allege that Saje: (1) did not occupy office space until March 1, 2023; (2) does not currently have the required certifications; (3) does not have a quality management system in place; (4) has not yet earned any revenue; (5) does not produce the same products as HHK; and

---

[2] Although Mrs. Sucharski was originally a named defendant in this action (ECF No. 1), all claims against her—namely, Counts I, II, III, and VII alleging misappropriation of trade secrets and unjust enrichment—have been dismissed. (ECF No. 38.) As such, she is no longer a party to this lawsuit.

(6) that, "by creating a competing company engaged in virtually the same manufacturing and sales activities as [HHK], it is inevitable that Mr. Sucharski will necessarily use and disclose [HHK]'s Protected Information for his own personal gain and to create an unfair competitive advantage for Saje." (*Id.* at ¶¶ 38–40.)

As relates specifically to the present Motion, Defendants contend HHK—specifically, Nepola—engaged in a series of unlawful business practices, intimidation of employees, and mismanagement that ultimately resulted in the suspension of HHK's critical AS9100 certification in or around August 2022 following the June 2022 audit. (ECF No. 47 at 23.) Defendants further allege Nepola scapegoated Sucharski for the suspension of HHK's AS9100 certification and "engag[ed] in a pattern of retaliatory conduct culminating in Sucharski's termination on November 18, 2022." (*Id.*)

### B. Procedural History

On January 8, 2024, HHK filed a motion to dismiss Defendants' original counterclaims. (ECF No. 44.) On January 22, 2024, the parties agreed to extend the time for Defendants to file amended counterclaims as of right under Fed. R. Civ. P. Rule 15(a)(1)(B) to February 8, 2024, in which case the then-pending motion to dismiss Defendants' counterclaims would be deemed moot and HHK could answer or move to dismiss the amended counterclaims. (ECF No. 46.) On February 8, 2024, Defendants filed their Amended Counterclaims with their Answer to Complaint (ECF No. 47) and, on April 16, 2024, HHK filed a motion to dismiss Defendants' Amended Counterclaims (ECF No. 52). All responsive briefing was filed simultaneously pursuant to court order. (ECF No. 51.)

## II.    LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) ("[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545. (alterations in original). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Instead, assuming factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663 (citing *Twombly*, at 556). This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* at 678 (citing *Twombly*, at 556). "[D]etailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citations omitted).

In assessing plausibility, the Court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, it is clear that conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must now set out "sufficient factual matter" to show that the claim is facially plausible. *Iqbal*, 556 U.S. at 677. This "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The Supreme Court's ruling in Iqbal emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See id.* at 670.

While, as a general rule, the Court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (emphasis added) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-

pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

### III.  DECISION

HHK requests this Court dismiss both of Defendants' Amended Counterclaims alleging wrongful termination and trade libel and defamation. The Court addresses each of the counterclaims below.

#### A.  Wrongful Termination under CEPA (Counterclaim I)

In their first Amended Counterclaim, Defendants contend HHK wrongfully terminated Sucharski in violation of the New Jersey Conscientious Employee Protection Act ("CEPA") (N.J. Stat. Ann. §§ 34:19-1, *et seq.*) for various actions, refusals to take certain actions, and objections raised in response to alleged conduct by Nepola. (*See* ECF No. 47 at 48–50.) Specifically, Defendants point to: (1) "plea[s]" raised by Sucharski and certain HHK site operations managers to hire a new quality manager after the resignation of HHK's top quality manager shortly following a Summer 2021 surveillance audit (ECF No. 1 at 30); (2) "concerns" raised by Sucharski when Nepola demanded he and others "take care of" HHK's quality management system amidst a supposed lack of resources and forge ahead with an audit (*id.* at 31); (3) "demands" by Nepola that employees, including Sucharski, "certify compliance with customers' requirements and specifications where those specifications either were not met or were not able to be verified as having been met" in relation to getting an unused passivation tank at HHK's Virginia facility "up and running" (*id.* at 31, 50); and (4) Nepola's insistence that Sucharski "terminate [certain managers] before the Recertification Audit occurred or to, at a minimum, prevent or restrict their involvement in the Recertification Audit, out of [] Nepola's concerns of what they would reveal or state to the auditors," allegedly to hide the very problems of which Sucharski and others had been

complaining and which, according to Defendants, ultimately led to the suspension of HHK's AS9100 certification following the Recertification Audit (*id.* at 32–35). Defendants argue each of these actions or inactions, taken together, constitute whistleblowing activities in which Sucharski engaged and for which he was wrongfully terminated by HHK. (*See* ECF No. 47 at 48–50.)

In support of its motion to dismiss, HHK argues that Defendants' Amended Counterclaims, which allege "nebulous" concerns about Nepola's management decisions, ultimately fall short of the pleading standard under CEPA. (ECF No. 52 at 8.) Specifically, HHK contends Defendants failed to sufficiently allege: (1) a reasonable belief of a violation of law, rule, regulation, or public policy, or conduct that was fraudulent or criminal; (2) that Sucharski engaged in any whistleblowing activity; and (3) there is any causal connection between the whistleblowing activity and the adverse employment action. (*Id.* at 17–27.) Regarding the reasonable belief of a violation of law, rule, regulation, or public policy, HHK asserts Sucharski fails to allege that he conveyed his reasonable belief of a legal violation to HHK, and that there is no "substantial nexus," as required by CEPA, between the relevant laws and/or policies and HHK's alleged conduct. (*Id.* at 18–25.)

CEPA prohibits employers from taking retaliatory action against an employee who disagrees with or refuses to engage in illegal or otherwise unethical workplace activities. *See* N.J. Stat. Ann. § 34:19-1; *Pierre v. Otsuka Am. Pharm.*, Civ. A. No. 23-21848, 2024 WL 1704847, at *6 (D.N.J. Apr. 19, 2024). To state a claim under CEPA, the New Jersey Supreme Court has explained that a plaintiff must sufficiently allege: (1) a reasonable belief the complained-of employer conduct violated a law, rule, regulation, or public policy, or is fraudulent or criminal; (2) whistleblowing activity; (3) an adverse employment action; and (4) a causal connection between the whistleblowing activity and the adverse employment action. *See Dzwonar v. McDevitt*, 828

12

A.2d 893, 900 (N.J. 2003); *Young v. Twp. of Irvington*, 629 F. App'x 352, 356 (3d Cir. 2015). "'The initial burden of making a prima facie [CEPA] case is relatively easy to meet,' and is satisfied 'when sufficient evidence is offered such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons.'" *Griffin v. Metromedia Energy, Inc.*, Civ. No. 10-3739, 2011 WL 12872504, at *2 (D.N.J. Feb. 7, 2011) (quoting *Bowles v. City of Camden*, 993 F. Supp. 255, 264–65 (D.N.J. 1998)). Indeed, the New Jersey Supreme Court has described CEPA as "remedial legislation . . . [which] 'should be construed liberally to effectuate its important social goal.'" *Dzwonar*, 828 A.2d at 901 (quoting *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994)).

It is undisputed that Sucharski was terminated from HHK and that termination is an adverse employment action under CEPA § 34:19-2(e). The third element of a CEPA claim, then, is satisfied. The discussion that follows will therefore focus on the remaining elements.

### 1. Defendants Sufficiently Pled Reasonable Belief of a Violation of Law, Rule, Regulation, or Public Policy

Under CEPA, a plaintiff should allege an identifiable "statute, regulation, rule or public policy that closely relates to the complained-of conduct." *Pierre*, 2024 WL 1704847 at *7 (quoting *Dzwonar,* 828 A.2d at 901). A court can, on its own, identify the law or policy that might have been implicated by the challenged conduct so long as the plaintiff alleges sufficient details. *See Griffin*, 2011 WL 12872504 at *3; *accord Scioscia v. Walmart Corp.*, Civ. No. 23-01940, 2023 WL 8237407 *2 (D.N.J. Nov. 28, 2023). A plaintiff need not allege an actual legal violation but a *reasonable belief* that the challenged employer conduct constituted a violation. *See Arterbridge v. Wayfair, LLC*, No. 1:21-cv-13306, 2022 WL 577956, at *3 (D.N.J. Feb. 25, 2022). The allegedly unlawful behavior must be more than a private dispute between the employee and employer. *Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1013 (N.J. 1998). Where there is no identifiable law

or public policy believed to have been violated by the employee, the New Jersey Supreme Court and lower courts agree that the trial court can and should find in favor of the moving party and dismiss the CEPA claim. *Pierre*, 2024 WL 1704847, at *7 (citing *Safonof v. DirectSat USA*, No. 19-7523, 2020 WL 7074255, at *3 (D.N.J. Dec. 3, 2020); *Dzwonar*, 828 A.2d at 901). Accordingly, provided a plaintiff alleges a reasonable belief the challenged conduct is illegal or otherwise a violation of public policy, and the court finds a law to which the conduct is related, a CEPA claim will survive a motion to dismiss with respect to the first CEPA prong. *Robert v. Autopart Int'l*, Civ. A. No. 3:14-cv-07266, 2015 WL 4031740, at *2 (D.N.J. June 30, 2015).

In their Amended Counterclaims, Defendants noted several company practices and activities to which Sucharski, and allegedly others in the company, objected or expressed concerns that could form the basis for a reasonable belief of a violation of law or public policy. (*See* ECF No. 47.) Defendants contend Sucharski objected to a number of Nepola's practices relating to various internal audits, the Recertification Audit, and "'pencil whipping' and document manipulation and concealment[;]"; specifically, Defendants point to: (1) "plea[s]" raised by Sucharski and certain HHK site operations managers to hire a new quality manager after the resignation of HHK's top quality manager shortly following a Summer 2021 surveillance audit (*id.* at 30); (2) "concerns" raised by Sucharski when Nepola demanded he and others "take care of" HHK's quality management system amidst a supposed lack of resources and forge ahead with an audit (*id.* at 31); (3) "demands" by Nepola that employees, including Sucharski, "certify compliance with customers' requirements and specifications where those specifications either were not met or were not able to be verified as having been met" in relation to getting an unused passivation tank at HHK's Virginia facility "up and running" (*id.* at 31, 50); and (4) Nepola's insistence that Sucharski "terminate [certain managers] before the Recertification Audit occurred

or to, at a minimum, prevent or restrict their involvement in the Recertification Audit, out of []
Nepola's concerns of what they would reveal or state to the auditors," allegedly to hide the very
problems of which Sucharski and others had been complaining and which, according to
Defendants, ultimately led to the suspension of HHK's AS9100 certification following the
Recertification Audit (*id.* at 32–35).

As discussed below, *infra* Section III.A.1.b., Defendants cite several statutes, regulatory
standards, and public policies they contend HHK violated in pursuing its stated course of action.
Given Sucharski's repeated allegations of concern and objections to HHK practices that would, if
true, violate a plethora of identifiable laws and public policies, the Court finds this element is
sufficiently plead.

HHK argues "[e]ven if the Amended Counterclaims are liberally construed as alleging that
Sucharski communicated his 'concerns' to Nepola," Defendants fail to convey a reasonable belief
of a violation of law or policy. (ECF No. 52 at 19.) HHK relies on a string of cases that either does
not contradict or in fact directly supports—presuming Defendants' allegations are true—this
Court's finding that Sucharski reasonably believed HHK's conduct was a violation of law or policy.
The court in *Henson*—in which an employee claiming CEPA violations for termination after a
positive drug test was found to have sufficiently pled a reasonable belief of a legal violation,
although the claim was ultimately dismissed for failure to show a causal nexus—highlights the
relevance of the frequency with which a plaintiff communicates concerns about the legality of his
or her employer's challenged conduct. *Henson v. Daimler Truck N. Am., LLC*, Civ. No. 22-cv-
6479, 2023 WL 3072532, at *7 (D.N.J. Apr. 25, 2023). In that case, the employee expressed
concerns directly to his supervisor and followed-up repeatedly with the same message; similarly,
here, Defendants allege Sucharski conveyed his own concerns, as well as those of several

colleagues, regarding inadequate safety and compliance practices to Nepola on numerous occasions, receiving some dismissive responses ("take care of it") (ECF No. 47 at 31) and other plainly vindictive ones, such as when Nepola demanded Sucharski terminate detractors (*see id.* at 32–35).

Moreover, in *Blackburn*—in which an employee failed to state a CEPA claim because he merely expressed concern that certain employer practices might become illegal should they persist—the court emphasized plaintiffs alleging a CEPA violation must have reasonably believed the complained-of conduct was a then-present violation of law or policy. *Blackburn v. United Parcel Serv., Inc.*, 3 F. Supp. 2d 504, 516 (D.N.J. 1998). Unlike in *Blackburn*, here, Defendants contend Sucharski began conveying concerns regarding the demands Nepola had been making to Sucharski and others to bypass strict safety and manufacturing protocols and guidelines at least by March 2022, before traveling to HHK's Virginia facility and again after returning to New Jersey. (*See* ECF No. 47 at 32.)

In *Czukerberg*—in which an employee who refused to remove failing school grades was reprimanded by her employer—the court found the plaintiff-employee did not adequately plead a reasonable belief in a legal violation because, at most, she found the request to do so "very highly irregular." *Czukerberg v. State-Operated Sch. Dist. of City of Newark*, Dkt. No. A-4955-18, 2021 WL 1157683, at *11 (N.J. Super. Ct. App. Div. Mar. 26, 2021). Here, Defendants allege Sucharski consistently and explicitly based his concerns to Nepola in "the ethical and legal risks involved, the inability to inspect and test passivated products correctly and with calibrated equipment, and the ultimate need to certify that such products met the requirements and specifications of the customers' orders, including those of the federal government." (ECF No. 47 at 32.)

Finally, in *Robert*—in which an employee involved in a serious automobile accident refused to file a supposedly fraudulent insurance claim upon the direction of his employer and was later terminated—the court found insufficient supporting facts because the employee did not name the person with whom he communicated and who gave the allegedly illegal instruction, or the date, time, or location at which this conversation took place. 2015 WL 4031740. Quite the opposite, here, Defendants consistently contend Sucharski communicated with Nepola on several instances between March and June 2022, when the Recertification Audit took place; the allegations contain most of the types of facts held to be adequate in *Robert* because they repeatedly state Sucharski expressed concerns to Nepola and provide a general timeline of their interactions as well as the substance of their discussions. (*See* ECF No. 47 at 32.)

HHK also contends Defendants admitted HHK had "legitimate business reasons" to want the passivation tank functioning properly and therefore could not have had any concerns about legal violations. (ECF No. 52 at 11, 20, 29.) The court disagrees. A plain reading of the relevant section in Defendants' Amended Counterclaims demonstrates that Defendants merely conceded business reasons may have been a driving force in HHK's desire while explicitly maintaining Nepola's course of action, in their view, "collided with concerns regarding safety, [] compliance with laws, standards, and customer requirements and specifications, and . . . the inspection, testing, and ultimate certification of products that were to be passivated at that facility." (ECF No. 47 at 31.)

One of the cases on which HHK relies explicitly states that whether a plaintiff had a reasonable belief of a legal violation is a "threshold legal issue" to be decided by the Court based on the pleadings and knowledge of the law. (ECF No. 52 at 18 (quoting *Klein v. Univ. of Med. & Dentistry of New Jersey*, 871 A.2d 681, 688 (N.J. App. Div. 2005).) Based on the allegations in the

Amended Counterclaims and New Jersey law, this Court finds Defendants sufficiently pled a reasonable belief in a violation of law or policy.

### a. Sucharski Sufficiently Alleged He Conveyed His Reasonable Belief of a Legal Violation to HHK

As the New Jersey Supreme Court held in *Dzwonar*, CEPA does not require plaintiffs to prove that a law "actually would be violated if all the facts he or she alleges are true" but rather asks plaintiffs to "put forth facts that would support *an objectively reasonable belief* that a violation has occurred." 828 A.2d at 901 (emphasis added). Were a trial court to find an objectively reasonable belief, the jury would then decide "whether the plaintiff actually held such a belief and, if so, whether [it] was objectively reasonable." *Id.* Moreover, the allegations must be supported with sufficient facts, such as dates, times, locations, and the mediums through which the communication(s) regarding the plaintiff's reasonable belief of a legal violation occurred. *Robert*, 2015 WL 4031740 at *3 (finding a plaintiff's claim of a reasonable belief of illegal conduct lacked adequate factual basis because, among other things, the pleading did not name any specific representative of the defendant as having participated in the alleged communication and did not include any facts regarding the date, time, location, or medium used). Indeed, plaintiffs must show that they specifically communicated their belief that the complained-of conduct was illegal; mere concerns that a law "might at some point in the future be violated if certain precautions are not taken" will not suffice. *Blackburn*, 3 F. Supp. 2d at 516.

The Court finds Defendants' allegations regarding any communications by Sucharski to HHK are sufficiently specific to support an objectively reasonable belief of a violation of law or policy. Although HHK correctly stressed Defendants' tendency for generalities, two allegations in the Amended Counterclaims that save Defendants' CEPA claim from dismissal. First, Defendants allege certain concerns "regarding a lack of resources to address adequately HHK's quality

18

management systems were raised by Sucharski or by the site manager in New Jersey" to which "Nepola would simply *instruct* [them] to 'take care of it,' often with questionable reporting and staging so as to be able to pass a surveillance audit." (ECF No. 47 at 30.) Second, Defendants allege Nepola "*spoke* with Sucharski and was furious that [the Virginia site manager] was not willing or able to get the passivation tank at the Virginia facility operational[.]" (*Id.* at 32.)

HHK contends Defendants "vaguely aver that there were 'concerns' . . . but not that Sucharski ever communicated them to Nepola" (ECF No. 52 at 18), but this is directly contradicted in at least the two above mentioned statements. These two instances strongly suggest at least two exchanges involving direct communication, whether in person or via telephone or email, between Sucharski and Nepola that also provide a rough timeline—in the lead-up to the Recertification Audit and following Sucharski's return to New Jersey following his last visit to the HHK Virginia facility, respectively. Therefore, Defendants provided many, though not all, of the types of details deemed adequate by New Jersey courts—namely, a rough timeline of dates, the name of the HHK representative to whom concerns were communicated, and the substance of those communications. *See, e.g.*, *Robert*, 2015 WL 4031740.

### b.  Sucharski Sufficiently Alleged a "Substantial Nexus" Between Identifiable Law or Policy and HHK's Alleged Conduct

In assessing the sufficiency of CEPA claims, courts must determine whether "there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff." *Caver v. City of Trenton*, 420 F.3d 243, 254 (3d Cir. 2005) (quoting *Dzwonar*, 828 A.2d at 901). Plaintiffs must specifically allege—with "a minimum amount of specificity"— the ways in which law or public policy, as relevant, were violated, thereby linking the challenged conduct to a violation of law or public policy and establishing the requisite nexus. *Paskas v. United Parcel Serv., Inc.*, Civ. A. No. 23-1162, 2023 WL 9017080, at *4 (D.N.J. Dec. 29, 2023); *see*

*Safonof v. DirectSat USA*, Civ. A. No. 19-07523, 2020 WL 1527946, at *4 (D.N.J. Mar. 31, 2020).

To prove a substantial nexus, then, CEPA requires "a close relationship between [the] claims and

[the cited] statute[, regulation or public policy]." *Dzwonar*, 828 A.2d at 903.

Here, Defendants cite several statutes, regulatory standards, and policies—some specific,

others general—in support of their argument that Sucharski reasonably believed HHK's conduct

was illegal; specifically, Defendants contend HHK violated: (1) "applicable regulatory standards

and private certification standards" (ECF No. 47 at 50); (2) "clear policy mandates of safety" (*id.*

at 51); (3) "fundamental" right[] to legal counsel (*id.* at 51); (4) the "AIR21 Whistleblower

Program," *see* 49 U.S.C. § 42121 (*id.*); (5) the False Claims Act, *see* 31 U.S.C. § 3729 (*id.*); (6)

the Defend Trade Secrets Act of 2016 ("DTSA"), *see* 18 U.S.C. § 1833(b)(3)(A), (*id.* at 51–52 ¶

79); and (7) CEPA, *see* N.J.S.A. §§ 34:19–3, *et seq.*, (*id.* at 52 ¶ 79.) The Court will consider each

in turn.

(i)     **"Applicable Regulatory Standards and Private Certification
Standards" and "Clear Policy Mandates of Safety"**

Defendants allege HHK failed to comply with "applicable regulatory standards and private

certification standards" and "false[ly] and deceptive[ly]" certified compliance with such standards

"where those specifications either were not met or were not able to be verified as having been

met." (ECF No. 47 at 50.) HHK contends this allegation "fails as a matter of law" because

Defendants failed to identify a specific regulation they believed was violated. (ECF No. 52 at 16.)

In support of its argument, HHK cites to several cases, including *Chiofalo v. State*, 213 A.3d 900

(2019). In *Chiofalo*—in which a New Jersey State Police officer filed a CEPA complaint against

his employer and certain supervisors for allegedly adverse employment actions after, among other

things, he refused to destroy internal documents—the New Jersey Supreme Court explained that

CEPA claims alleging violations of a general law, rule, or regulation "can be more obscure" and,

20

under the seminal *Dzwonar* decision, "either 'the court *or* the plaintiff'" can identify the law that relates to the challenged conduct. *Chiofalo*, 213 A.3d at 908, 910 (emphasis added).

Here, Defendants point to general "applicable regulatory standards and private certification standards," which, as *Chiofalo* explains, "can be more obscure," 213 A.3d at 910, and they also provide "sufficient factual allegations for the Court to make such a determination on its own[,]" *Scioscia*, 2023 WL 8237407 at *2, including explicit references to the ways in which Nepola allegedly directed them to skirt specific regulations and specifications in manufacturing and compliance practice. HHK relies on two other cases, in which employees were found to have insufficiently pled a violation of law, in support of the proposition that because Defendants did not identify a specific applicable regulation, their claim must fail. *Armah v. Educ. Affiliates, Inc.*, A-4644-13T2, 2015 WL 5038053 (N.J. Super. Ct. App. Div. Aug. 26, 2015); *see also Berdzik v. Physicians Endoscopy, LLC*, Civ. A. No. 20-11656, 2021 WL 3260857 (D.N.J. July 30, 2021). However, unlike in *Armah*, in which the employee merely alleged "unlawful" conduct, in conclusory fashion without additional factual support to point to identifiable law, 2015 WL 5038053 at *11, here, Defendants include ample factual support pointing to federal regulations as well as critical private certifications and standards required for participation in the aerospace industry.

Finally, HHK argues private certification standards like the AS9100 cannot be the basis for a CEPA claim because it is not law, citing *Defalco v. Rutgers Univ. Police Dep't*, Civ. A. No. 15-6607, 2017 WL 1250990 (D.N.J. Mar. 10, 2017). However, unlike in *Defalco*, in which the plaintiff alleged retaliation for complaining of employer's alleged violations of internal policies which the court found insufficient for a CEPA claim, here, AS9100 is an industry-wide, not internal, standard which all aerospace manufacturers are required to have to participate in the industry. The Court

finds HHK's arguments unconvincing and finds Defendants' citation to "applicable regulatory standards and private certification standards" sufficient to support a CEPA claim.

Defendants further maintain HHK was in violation of public policy mandates promoting safety for "the traveling public and military operations" stemming from alleged objections and concerns Sucharski raised regarding HHK practices leading up to the Recertification Audit (ECF No. 47 at 51.) HHK argues Defendants fail to meet their burden because they are required to point to a specific policy. In support of its argument, HHK cites to two cases, which, though relevant and compelling, do not doom Defendants' arguments in this respect. First, in *Parson*—in which a store employee alleged a CEPA violation after she was terminated purportedly for complaining about a supervisor to her human resources department—the court found a private employee manual was not a public policy, explaining plaintiffs must point to "legislation[,] administrative rules, regulations or decisions[,] and judicial decisions[,]" and even professional rules and codes which reflect "a high degree of public certitude in respect of acceptable versus inacceptable conduct." *Parson v. Home Depot USA, Inc.*, Civ. No. 13-4817, 2014 WL 820066, at *3 (D.N.J. Mar. 3, 2014) (citing *Mehlman v. Mobile Oil Corp.*, 707 A.2d 1000, 1009 (N.J. 1998)). Furthermore, in *Hitesman*—in which a nurse at a long-term nursing home facility was terminated after contacting government agencies and news media with allegations of improper patient care—the court found the code of ethics on which the nurse relied as the basis for his belief of a legal violation provided guidance for employee behavior and therefore did not provide a standard against which an employer's conduct could be measured. *Hitesman v. Bridgeway Inc.*, 63 A.3d 230, 241 (N.J. Super. App. Div. 2013).

Here, unlike in *Parsons* or *Hitesman*, Defendants allege HHK's conduct violated "laws, standards, and customer requirements and specification" relating to its AS9100 certification and

the accompanying Recertification Audit, which constitute professional and technical guidelines for manufacturers and other entities, not merely their employees, and encompass and reflect administrative regulations as well as private standards designed to meet requirements set by federal agencies.[3] Although Defendants did not cite specific provisions, regulations, or guidelines, they did provide sufficient details, *see supra* Section I.A., allowing the Court to identify the source of the laws or policies, starting with the AS9100 guidelines themselves and including federal agency rules and regulations pertaining to test methods and procedures, compliance, and monitoring requirements, among others, which reflect the government's and public's purpose of ensuring the highest safety standards. Just as in *Griffin*—in which an employee alleges he was wrongfully terminated after he complained about fraudulent business practices to supervisors and cites generally to "laws and regulations which prohibit fraud and deceitful business practices," which the court found satisfied the first CEPA prong—Defendants similarly invoke "clear policy mandates of safety" which abound in federal regulations allowing the Court to easily identify them. 2011 WL 12872504 at *3.

Therefore, because Defendants allege numerous facts regarding concerns for the ways in which HHK purportedly ignored and otherwise violated important safety requirements, *see supra* Section I.A., their citation to "clear policy mandates of safety" is sufficiently precise, relates directly to their allegations, and as such satisfies the substantial nexus requirement for the CEPA claim.

---

[3] In their Amended Counterclaims, Defendants contend the AS9100 certification and auditing processes are "essential for maintaining aerospace approvals, qualifications, and shipment authorities in th[e] industry and to meet customer requirements[,]" which include federal agencies. (ECF No. 47 at 30.) Given the Court is assessing the sufficiency of their counterclaims to determine whether to grant or deny HHK's present motion to dismiss, Defendants are entitled to a presumption these allegations are true at this time.

### (ii)    "Fundamental" Right to Legal Counsel

According to the allegations in the Amended Counterclaims, Defendants argue HHK violated Sucharski's fundamental right to legal counsel by not allowing him an opportunity to consult with an attorney regarding the Intellectual Property Acknowledgement. (ECF No. 47 at 52.) HHK maintains there is no such right under either federal or state law. (ECF No. 52 at 25.) The Court agrees. This Court is not aware of any precedent outside of the criminal context, in which criminal defendants are constitutionally guaranteed the right to counsel at critical stages of litigation, and with respect to some indigent defendants.[4] This is therefore inadequate as a basis for a CEPA claim.

### (iii)    The "AIR21 Whistleblower Program"

Defendants contend HHK violated 49 U.S.C. § 42121 (ECF No. 47 at 51) by terminating him after his complaints to Nepola regarding company practices that were allegedly illegal. HHK responds Defendants fail to show the statute is applicable because: (1) while it relates specifically to FAA orders and regulations, the Amended Counterclaims do not explicitly cite to FAA law; and (2) they do not allege HHK held a certificate required to render the statute applicable (ECF No. 52 at 21). Under the statute, "a holder of a certificate . . . may not discharge an employee or otherwise discriminate against an employee because the employee provided, caused to be provided, or is about to provide or cause to be provided to the employer or Federal Government information relating to any violation . . . of any order, regulation, or standard of the Federal Aviation Administration or any other provision of Federal Law relating to aviation safety . . . ." 49 U.S.C.

---

[4] HHK cites unconvincing state law on this point. *See, e.g.*, *In re Adoption of J.E.V.*, 141 A.3d 254, 264 (N.J. 2016) (holding that indigent parents facing termination of parental rights have a right to appointed counsel because the termination of parental rights is a "consequence of magnitude," which also includes cases presenting a possible prison sentence, loss of driving privileges, or a fine exceeding $800).

§ 42121(a). Although plaintiffs are not required to explicitly identify the law or policy they allege was violated by the defendant's conduct provided they plead enough facts such that one is identifiable by the court, *see, e.g.*, *Griffin*, 2011 WL 12872504 at *3, HHK's second argument regarding the applicability of the statute is well-taken. Defendants here cannot ground their allegation of unlawful conduct in a statute whose bedrock elements they do not plead and therefore fail to satisfy. *See Hitesman*, 63 A.3d at 240; *Dzwonar*, 828 A.2d at 903–04. Therefore, this statute cannot be the basis for establishing the requisite substantial nexus with HHK's allegedly illegal conduct.

### (iv)    The False Claims Act

Next, Defendants cite to the False Claims Act, which creates civil liability for anyone who, among other things, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. § 3729(a)(1)(A), (G).  Defendants allege that, given various government entities were customers of HHK and HHK purportedly skirted certain technical and compliance protocols in its manufacturing processes, HHK was in violation of the False Claims Act. In response, HHK argues Defendants do not meet the elements of the statute because the Amended Counterclaims do not include "any concerns to Plaintiff or anyone else about monetary claims to the federal government" or "any allegations connecting any of the allegedly improper conduct by Nepola to any claims for payment, let alone false payment, against the United States Government." (ECF No. 52 at 22.) The Court finds HHK's arguments here inaccurate insofar as they imply the statute is concerned only with monetary claims or payments and ignore several other subsections—including Subsection (G) above—which explicitly refer to property, documents, and false records and statements, *see*

31 U.S.C. § 3729(a)(1)(B)–(E), (G), some of which Defendants do allege were improperly and unlawfully made, specifically with respect to the Recertification Audit (*see* ECF No. 47 at 48–50).

The Court disagrees with HHK's contentions that Defendants' argument here is improperly conditional. While HHK is correct Defendants use such speculative language alleging HHK's conduct would constitute "potentially a false claim to the government, if the government is the customer," (ECF No. 47 at 28), a full reading of the pleading reveals a simple reason: no discovery has yet occurred. While Defendants cannot be sure the government absolutely was a customer affected by HHK's allegedly illegal conduct, Defendants would know for certain, one way or the other, if the government is an affected HHK customer once discovery is underway. While HHK is correct that the case law prohibits speculative pleading, it misses a key distinguishing factor. Unlike in *Blackburn* and *White*, in which the courts rightly prohibited plaintiffs from proceeding with allegations that were expressly speculative about the ultimate question of legality, here, any speculation is with respect to one detail—whether HHK's relevant customers were government entities—the veracity of which would instantly reveal the success or failure of the claim. *Blackburn*, 3 F. Supp. 2d at 514; *White v. Smiths Detection, Inc.*, Civ. A. No. 10-4078, 2010 WL 4269424, at *4 (D.N.J. Oct. 22, 2010).

The Court therefore finds Defendants sufficiently plead a substantial nexus between HHK's allegedly illegal conduct here and the False Claims Act.

### (v)    The Defend Trade Secrets Act of 2016

Defendants also point to the exceptions in the Defend Trade Secrets Act, which prohibits unauthorized disclosure or (mis)use of trade secrets, that require employers to include "in any contract or agreement with an employee" notice of immunity from liability for disclosing trade secret information under a certain set of conditions. 18 U.S.C. § 1833(b)(3)(A). Defendants argue

HHK violated this statute by failing to include a notice in the Intellectual Property Acknowledgement that employees, including Sucharski, were asked to sign. (*See* ECF No. 47 at 52.) In response, HHK contends Sucharski did not raise such concerns regarding the legality of the Intellectual Property Acknowledgement and his failure to sign the agreement does not constitute whistleblowing activity. (*See* ECF No. 52 at 22.) However, neither argument is compelling because neither raising concerns of legality nor whistleblowing activity is required for this notice requirement to be applicable; the mere fact of an employer contract or agreement with an employee in matters regarding "the use of trade secret or other confidential information" make this requirement automatically binding. 18 U.S.C. § 1833(b)(3)(A). Therefore, given Defendants' allegation that HHK asked Sucharski to sign an agreement that does not include a notice of immunity as required by this statute, Defendants here adequately established a substantial nexus between HHK's conduct here and the Defend Trade Secrets Act.

### (vi) CEPA

Finally, Defendants allege HHK violated CEPA—the overarching claim constituting their first of two counterclaims from which they are seeking relief—when it terminated Sucharski allegedly in retaliation for not terminating a subordinate. (*See* ECF No. 47 at 52.) HHK's response here is quite bare, arguing: (1) Defendant is engaging in circular reasoning; and (2) no employee Sucharski was allegedly asked to fire had a reasonable belief that HHK was engaging in unlawful conduct. (*See* ECF No. 52 at 23.) Neither argument is availing. First, although Defendants' argument here creates two layers of interconnected CEPA claims, the argument is not circular but rather underscores that there are multiple challenged practices or types of conduct: one strand of conduct involves objections to and concerns regarding communications from Nepola allegedly to bypass important safety and compliance requirements with regards to the passivation tank at

HHK's Virginia facility and the Recertification Audit, a second relates to Sucharski's failure to sign the Intellectual Property Acknowledgement, and a third concerns this alleged retaliation against Sucharski for not terminating another employee. Moreover, HHK's second argument suggests a fundamental misunderstanding of the law because CEPA requires a plaintiff—not any other party, regardless of how closely the facts or their interests may relate to the cause of action— to show a reasonable belief that the employer's challenged conduct violated law or policy. *See, e.g.*, *Dzwonar*, 828 A.2d at 900. Therefore, Defendants have shown a sufficiently substantial nexus between HHK's conduct here and CEPA.

### 2. Defendants Sufficiently Pled Whistleblowing Activity

A plaintiff must show that he or she engaged in a whistleblowing activity to satisfy the second prong of a CEPA wrongful termination claim. *See Rickerson v. Pinnacle Foods*, No. 2:17-cv-04469, 2017 WL 6034147, at *3 (D.N.J. Dec. 6, 2017). The New Jersey legislature defines whistleblowing activities as "objection[s] to, or refusal 'to participate in an activity, policy or practice which the employee reasonably believes . . . is in violation of a law, or a rule or regulation promulgated pursuant to law.'" *Id.* (quoting N.J. Stat. Ann. § 34:19-3(c)). A plaintiff must also show he engaged in the whistleblowing activity *with the knowledge or intention* that the activity embodies the objection to, or refusal to participate in, the allegedly illegal employer conduct. *See Arterbridge*, 2022 WL 577956 at *5. In other words, action that lacks specific knowledge or intention, or which is otherwise involuntary, cannot qualify as whistleblowing activity under the statute. *Id.*

Here, HHK argues there are no specific allegations Sucharski conveyed any concerns to Nepola (ECF No. 52 at 26), but this is directly contradicted by explicit assertions in the Amended Counterclaims, as discussed previously: this Court found at least two separate instances—one in

which Sucharski "spoke" with Nepola and another in which Nepola "instruct[ed]" Sucharski and others—that strongly suggest direct communications between Sucharski and HHK regarding his concerns. (ECF No. 47 at 30, 32.) On the other hand, HHK's argument that Sucharski did not engage in whistleblowing activity regarding the Intellectual Property Acknowledgement (ECF No. 52 at 26) is partly convincing because Defendants admit Sucharski did not refuse to sign the agreement and Sucharski's email to Nepola acknowledging its receipt does not contain any explicit objections to or concerns regarding it. However, the mere act of stating one's intention to consult with an attorney arguably carries some implicit concern regarding the underlying matter—in this case, about the Intellectual Property Agreement. Nevertheless, given that Defendants identify at least two separate incidents in which Sucharski and Nepola communicated directly and specifically addressing Sucharski's concerns and objections regarding HHK practices, the Court finds Defendants sufficiently allege whistleblowing activity.

### 3. Defendants Fail to Sufficiently Plead Causal Connection Between Sucharski's Whistleblowing Activity and His Termination by HHK

To survive a motion to dismiss a CEPA claim, a plaintiff must adequately allege a causal connection between the whistleblowing activity and the adverse employment action. *See Griffin*, 2011 WL 12872504 at *3. This means plaintiff must avoid conclusory allegations and instead include enough facts from which "the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." *Id.* ("Plaintiff cannot satisfy the fourth prong (causal connection) simply by satisfying the second and third prongs (whistle[]blowing activity and adverse employment action) and then stating in a conclusory fashion that the termination was in retaliation for the whistle[]blowing activity."). In some cases, courts have found temporal proximity between the whistleblowing activity and the challenged employer action to be so "'unusually suggestive' of retaliatory conduct as to obviate

the need for additional allegations to establish the causal nexus," though courts are generally reluctant to infer a causal nexus based on temporal proximity alone. *Paskas*, 2023 WL 9017080 at *6 (quoting *Young v. Hobart W. Grp.*, 897 A.2d 1063, 1073 (N.J. Super. Ct. App. Div. 2005)). Where temporal proximity is not found to be unusually suggestive, plaintiffs may still succeed in establishing a causal connection through other types of circumstantial evidence, such as a pattern of antagonism or pretext. *Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 856 (D.N.J. 2019).

Here, Defendants fail to plead a causal connection between Sucharski's whistleblowing activity and his termination by HHK, thus ultimately dooming their CEPA claim. It is undisputed that other employees discussed and disagreed with certain of HHK's activities; indeed, Defendants were the first to raise this set of facts in their Answer (*see, e.g.*, ECF No. 47 at 31). Given that HHK has not terminated or otherwise disciplined these other employees for the same concerns, there is an inference against retaliatory motive which Defendants do not overcome with any specific allegations showing Sucharski was treated less favorably than those other employees for engaging in the same activity. *See Cohen*, 419 F. Supp. 3d at 853. Indeed, Defendants detail that one HHK employee, Mladjenovic, shared in Sucharski's concerns regarding HHK's allegedly deficient quality management systems prior to the Recertification Audit and strongly intimate that Mladjenovic may have also conveyed those concerns to HHK directly (ECF No. 47 at 30–31.) Yet not only did Mladjenovic not suffer adverse employment action, but he was promoted to the role of President of HHK's New Jersey operations. (*Id.* at 34.) This fact alone prevents this Court from safely inferring "it is more likely than not that [Sucharski's termination was] based on impermissible reasons," and instead increases the strength of alternative theories for Sucharski's termination, including professional differences of opinion and a "lack of confidence" in him by company leadership. (*Id.* at 43.)

Although Defendants argue this Court should focus on Sucharski's possibly pretextual reassignment to HHK's after-market line of business as evidence of a causal connection between his whistleblowing and ultimate termination, this reassignment, whatever one was to make of it, does not explain away the fact Mladjenovic engaged in substantially the same or similar whistleblowing activity and yet avoided termination. Moreover, given Sucharski refused to terminate some employees as requested by Nepola, rather than bolstering one of Defendants' strongest foundations for an alleged CEPA violation, it underscores the alternative, and entirely lawful, theory that HHK terminated Sucharski because of a professional difference of opinion.

For these reasons, HHK's motion to dismiss is **GRANTED** with regard to the wrongful termination counterclaim. The Court therefore need not discuss the sufficiency of Defendants' pleadings regarding allegedly fraudulent or criminal conduct.

### B.  Common Law Defamation and Trade Libel (Counterclaim II)

Defendants' Second Amended Counterclaim contends HHK engaged in defamation and trade libel by directly publishing online and communicating to the press and third parties purportedly false statements concerning Sucharski's termination and Saje's business. (*See* ECF No. 47 at 55–56.) HHK asserts Defendants fail to state a claim for defamation or trade libel because the allegedly defamatory and libelous statements made by HHK are "facially neutral and nondefamatory[,]" "speculative and non-specific[,]" and "wholly conclusory and devoid of context." (*Id.* at 31–33.)

"The law of defamation exists to achieve the proper balance between protecting reputation and protecting free speech." *DeAngelis v. Hill*, 847 A.2d. 1261, 1267 (N.J. 2004) (quoting *Ward v. Zelikovsky*, 643 A.2d 972, 978 (N.J. 1994)). It protects the right of people to "be free to enjoy their reputations without suffering false and defamatory attacks." *Okeke v. Anekwe*, Dkt. No. A-3391-

20, 2022 WL 2674944, at *5 (N.J. Super. Ct. App. Div July 12, 2022). Indeed, a defendant can be found liable for defamation for publishing a false statement that harms another's reputation. *Id.* The tort of defamation requires plaintiffs to prove: "defendant[] made a false and defamatory statement concerning [the plaintiff[s]]; (2) [] the statement was communicated to another person (and was not privileged); and (3) [] defendant[] acted negligently or with actual malice[,]" with negligence evaluated under a preponderance of the evidence standard and malice under a clear and convincing evidence standard. *Id.* (quoting *G.D. v. Kenny*, 15 A.3d 300, 310 (N.J. 2011)). With regard to the first prong, whether a statement is false depends on if it is one of fact or opinion; whereas statements of fact can be objectively proved or disproved, opinion statements "reflect a person's state of mind" and are thus protected. *Id.* (quoting *NuWave Inv. Corp. v. Hyman Beck & Co.*, 75 A.3d 1241, 1250 (N.J. Super. App. Div. 2013). Opinions can be actionable as defamation, however, where they "impl[y] 'reasonably specific assertions' of underlying objective facts that are false.'" *Id.* A defamatory statement is one which "impute[s] . . . 'fraud, deceit, dishonesty, or reprehensible conduct'" to the plaintiff. *Gillon v. Bernstein*, 218 F. Supp. 3d 285, 296 (D.N.J. 2016) (quoting *Dairy Stores, Inc. v. Sentinel Pub. Co., Inc.*, 516 A.2d 220, 238 (N.J. 1986) (Garibaldi, J., concurring)). Courts have explained the aspect of whether a statement is defamatory is generally a legal question subject to a court's discretion, though it could be subject to a jury's deliberations where the statement is ambiguous and could be reasonably defined as both a defamatory and opinion statement. *Id.* (citing *Ward*, 643 A.2d at 978).

Mirroring those of defamation, the elements of trade libel—also known as product disparagement—in New Jersey are: "(1) publication; (2) with malice; (3) of false allegations concerning another's property, product, or business; and (4) special—i.e., pecuniary—damages." *Benecard Serv., Inc. v. Allied World Specialty Ins. Co.*, Civ. A. No. 15-8593, 2020 WL 2842151, at

*13 (D.N.J. May 31, 2020) (quoting *Albion Eng'g Co. v. Hartford Fire Ins. Co.*, 779 Fed. Appx. 85, 88 (3d Cir. 2019)); *see also Gillon*, 218 F. Supp. 3d at 294. Unlike defamation, however, trade libel "is an offshoot of the cause of action for interference with contractual relations," *Gillon*, 218 F. Supp. 3d at 295, and as such requires some proof showing "a material and substantial part in leading others not to deal with plaintiff." *Patel v. Soriano*, 848 A.2d 803, 835 (N.J. Super. App. Div. 2004).

A statement may satisfy the elements of both defamation and trade libel simultaneously. *Gillon*, 218 F. Supp. 3d at 296. The critical questions before the Court are whether the four allegedly defamatory statements from HHK's November 30, 2022 LinkedIn post (the "LinkedIn Post") and subsequent communications "impute . . . 'fraud, deceit, dishonesty, or reprehensible conduct'" and are therefore defamatory, *id.*, and—with regards to the trade libel counterclaim— whether they constitute "material derogatory to the quality of a plaintiff's business, or to his business in general, of a kind calculated to prevent others from dealing with him, or otherwise to interfere adversely with his relations with others." *Benecard*, 2020 WL 2842151 at *13 (quoting *Patel*, 848 A.2d 803 at 835). Because Defendants do not plead with any specificity any facts regarding the contents of specific defamatory or libelous statements besides those included in HHK's LinkedIn Post—much less prove any such statements were published or communicated to any third parties—the Court will consider only the statements with regard to the LinkedIn Post.

### 1. The Allegations that: (1) Saje is Competing with HHK; (2) Saje is Manufacturing the Same Products as HHK; and (3) Saje is Not Capable of Manufacturing Parts for the Aerospace and Defense Industries

These statements are treated together as one group because they refer to competitive relationships amongst businesses, products, and manufacturing capabilities, respectively. Defendants specifically allege these statements were made with reference to Saje "on LinkedIn,

communicated with the press in written articles, and, upon information and belief, communicated with third parties." (ECF No. 47 at 55.) However, none of these statements can serve as the basis for either a defamation or trade libel claim because: (1) Defendants provide details only with regards to the LinkedIn Post and none of these statements appear within that post, either explicitly or implicitly; and (2) the post refers only to Sucharski, not Saje, whereas Defendants specifically claim these statements defame Saje. Moreover, the LinkedIn Post only discusses events surrounding Sucharski's failure to sign the Intellectual Property Acknowledgement and reasons underlying his termination, making no mention of possibly competing businesses or the products or manufacturing capabilities of any such businesses. Furthermore, even assuming the LinkedIn Post had included these statements, none of them, without more, reflect negatively on either of the Defendants but merely present ordinary, fact-based statements about another business that are, in HHK's terms, "facially neutral[.]" (ECF No. 52 at 31.) These statements, therefore, fail to sustain a prima facie case for either defamation or trade libel because they do not appear to have been made or published on the basis of the allegations contained in the Amended Counterclaims.

### 2. The Allegation Saje Has Misappropriated or Otherwise Used or Disclosed or is Planning to Misappropriate or Otherwise Use or Disclose Confidential and/or Trade Secret Information Belonging to HHK

Unlike the three other statements at issue, this statement would seem to reflect negatively on a person's or business's reputation in the community and could therefore support a defamation claim. Defendants contend this statement, like those mentioned above, was published in a variety of mediums, including in HHK's LinkedIn Post, written articles, and to third parties. (*See* ECF No. 47 at 55.) This statement—although it comes substantively closer to defamation than do the above-mentioned statements—suffers from the same infirmities. While the central message of the statement does appear within the LinkedIn Post, it is made only with respect to Sucharski and not

Saje. Moreover, because it is not contained within the LinkedIn Post, Defendants provide no specific details to support a finding that this statement was published in any form. Therefore, Defendants fail to satisfy the elements for both defamation and trade libel requiring publication as well as the defamation element requiring the statement at issue to concern the plaintiff.

For these reasons, HHK's motion to dismiss is **GRANTED** with regards to both the defamation and trade libel counterclaims.

## IV.    CONCLUSION

For the reasons set forth above, and for good cause having been shown, HHK's Motion to Dismiss Defendants' Amended Counterclaims (ECF No. 52) is **GRANTED** and the counterclaims are **DISMISSED WITHOUT PREJUDICE** with leave to amend.


Date: November 1, 2024                     /s/ *Brian R. Martinotti*
                                          **HON. BRIAN R. MARTINOTTI**
                                          **UNITED STATES DISTRICT JUDGE**