<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| HO-HO-KUS, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>STEVEN SUCHARSKI, JANEEN<br>SUCHARSKI, and SAJE AEROSPACE,<br>INC.,<br>                    Defendants. | Case No. 2:23-cv-01677 (BRM) (JSA)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Plaintiff Ho-Ho-Kus, Inc.'s ("HHK") Motion to Dismiss ("Motion") Defendants Steven Sucharski's ("Sucharski") and Saje Aerospace, Inc.'s ("Saje") (together with Sucharski, "Defendants") Second Amended Counterclaims (ECF No. 61) pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 64). Defendants filed an opposition to the Motion (ECF No. 67), and HHK filed a reply (ECF No. 68). Having reviewed and considered the submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, HHK's Motion to Dismiss Defendants' Second Amended Counterclaims (ECF No. 64) is **GRANTED** in part and **DENIED** in part.

### I.    BACKGROUND

For the purpose of this Motion, the Court accepts the factual allegations in the Second Amended Counterclaims as true and draws all inferences in the light most favorable to Defendants. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any

"document integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

The factual and procedural backgrounds of this matter are well-known to the parties and were previously recounted in great depth by the Court in its prior opinions: (1) granting in part and denying in part Defendants' Motion to Dismiss and denying HHK's application for a Preliminary Injunction and Temporary Restraining Order (ECF No. 38); and (2) granting HHK's Motion to Dismiss Defendants' Amended Counterclaims (ECF No. 55). Accordingly, the Court will recount only the factual background and procedural history associated with this Motion.

**A. Factual Background**

HHK is a New Jersey corporation founded in 1992 (Compl. (ECF No. 1) ¶¶ 8, 10) that designs and manufactures high precision parts and components for certain commercial and government/military customers based on detailed proprietary prints and models provided to the company (*id.* at ¶ 11; Second Am. Countercls. (ECF No. 61) ¶ 5.) Sucharski served as General Manager and President of HHK from 2015 to 2022, during which time he oversaw all aspects of the business and was responsible for developing and safeguarding its proprietary information. (ECF No. 1 ¶¶ 22–23.) Specifically, Sucharski oversaw sales, business development, and customer relationships in addition to supervising the engineering manager in Fair Lawn, New Jersey and the on-site operations managers at HHK's Paterson, New Jersey and Richmond, Virginia manufacturing facilities. (ECF No. 61 ¶ 15.)

During Sucharski's employment with HHK, owner and director, Tom Nepola ("Nepola"), was directly engaged in supporting, negotiating, and approving major customer and supplier contracts, exclusively oversaw the VP of Finance, and was involved in nearly all other aspects of HHK's business. (*Id.* ¶ 16.) Throughout his time at HHK, Sucharski became concerned with

allegedly unlawful and deceptive practices mandates by Nepola. (*Id.* ¶ 17.) Nepola allegedly disregarded laws, standards, the regulatory regime, and certain requirements needed to engage lawfully and safely in the industry, and instead cut corners and shifted responsibility to others within HHK, which Sucharski and other employees witnessed. (*Id.*)

The industry in which HHK operates is highly regulated, and manufacturers, including HHK, and others are "subject to non-government standards, certifications, and accreditation that is required even to design, manufacture, or sell parts of this nature[.]" (*Id.* ¶ 18.) Principal among these required certifications is the AS9100 certification, an audit for which HHK underwent annually with a more comprehensive re-certification audit every third year. (*Id.* ¶¶ 19–20.) The recertification audits covered, among other things, quality management systems and procedures. (*Id.* ¶ 20.) In June 2022, HHK underwent a recertification audit (the "Recertification Audit") designed to ensure compliance with guidelines set forth by SAE International, the governing body that maintains aerospace approvals, qualifications and shipment authorities in the industry. (*Id.* ¶ 21.) The last audit before the June 2022 audit occurred one year prior in the Summer of 2021 and was followed soon thereafter by the resignation of HHK's top quality manager. (*Id.*) Nepola did not permit Sucharski or others to immediately hire a replacement quality manager and only approved a new hire in March 2022 after Sucharski and HHK's New Jersey and Virginia site operations managers "pleaded with [him]" to do so. (*Id.* ¶ 22.)

Nepola would instruct Sucharski or other site operations managers to "take care of it" whenever they raised "concerns" regarding a lack of resources to adequately address HHK's quality management systems, often with dubious reporting and staging to pass an audit without resolving underlying issues or providing adequate resources to maintain an AS9100-compliant system. (*Id.* ¶ 23.) In one instance, HHK's Virginia site operations manager "expressed deep

concern" to Sucharski regarding Nepola's requested course of action and promised to alert relevant authorities if Nepola continued to pressure employees to engage in questionable reporting and conduct during internal and external audits related to critical topics like "calibration, special process compliance, and production traceability." (*Id.*) Sucharski and others had many concerns—which Nepola consistently "disregarded"—related to Nepola's "demands in early 2022" for the Virginia facility to get its unused passivation tank "up and running." (*Id.* ¶ 25.) In particular, Sucharski alleges Nepola demanded he and others "certify compliance with customers' requirements and specifications," which, in actuality, "were either not met or were not able to be verified as having been met." (*Id.* ¶ 92.) Sucharski spoke with Nepola about Nepola's demands regarding the passivation tank ahead of a visit to HHK's Virginia facility in late March 2022, and Nepola "ordered" Sucharski to address those issues with the Virginia site operations manager. (*Id.* ¶ 26.) Stuart Kennedy ("Kennedy"), the Virginia site operations manager, like Sucharski, "was unwilling to cut corners to meet Nepola's demands and explained all the steps, processes, and resources that would be needed to safely and lawfully set up and operate the passivation tank" as well as "to support the production and ultimate certification of compliant products." (*Id.*) Sucharski spoke with Nepola after his return to New Jersey, who told him he was furious that Kennedy was not willing or able to get the passivation tank operational and demanded that Sucharski fire the manager, which Sucharski refused to do. (*Id.* ¶ 27.)

In the weeks before the 2022 Recertification Audit, Sucharski—along with various subordinates, including Kennedy and Slobodan Mladjenovic ("Mladjenovic"), the New Jersey site operations manager—agreed "to do the best [they] could with the limited time and resources available but, at Sucharski's direction, without the illegal and unethical misdirection and pencil-whipping demanded of Mr. Nepola." (*Id.* ¶ 28.) Meanwhile, Nepola demanded Sucharski terminate

both Kennedy and Mladjenovic before the Recertification Audit occurred or to otherwise "prevent or restrict their involvement" in it because of Nepola's concerns regarding what they might reveal to the auditors. (*Id*.) Sucharski refused to comply with the demands. (*Id.*) The Recertification Audit identified fifteen areas of concern in the company's practices and procedures for immediate correction for HHK to maintain AS9100 certification. (*Id.* ¶ 29.) In August 2022, HHK's AS9100 certification was suspended. (*Id.* ¶ 31.) One week after the Recertification Audit, HHK announced "a sudden and complete reorganization, starting with Sucharski's immediate removal as President of HHK," which Defendants allege marks the beginning of HHK's "retaliatory, hostile course of conduct." (*Id.* ¶ 34.) Sucharski's position as President of HHK was broken up into individual presidents for each of HHK's operational bases—Mladjenovic was promoted from New Jersey site operations manager to President of HHK's New Jersey operations, and Derek George ("George") was appointed as President of HHK's Virginia operations despite purportedly having been employed by HHK for just one month. (*Id.* ¶ 35.) This reshuffling purportedly gave Nepola "the 'yes men' to do his bidding." (*Id.*)

Mladjenovic was purportedly "buffered" by Sucharski from Nepola's demands, which were "primarily communicated directly to Sucharski who was responsible for operations at both HHK sites[,]" and did not "openly buck[]" Nepola. (*Id.* ¶ 36.) "While Mr. Mladjenovic may have, at times, agreed with the concerns raised by Sucharski and others in regards to a lack of resources at HHK," Mladjenovic never "openly refused" to comply with Nepola's demands. (*Id.*) Moreover, Mladjenovic had a "passive nature," "presented a valuable opportunity for control by Nepola because he could be close by at HHK's New Jersey [s]ite where Mr. Nepola could keep him on a short leash[,]" and "was already compromised and under Mr. Nepola's influence and intimidation when he was appointed as 'President' of HHK's New Jersey operations because, by that time, Mr.

Nepola had . . . provided Mr. Mladjenovic with money for Mr. Mladjenovic's mother's apartment in Serbia[.]" (*Id.*) Likewise, "Mr. George was [] an attractive fit to exact Mr. Nepola's demands and was . . . ripe for Mr. Nepola's influence and intimidation." (*Id.* ¶ 37.)

Kennedy was allegedly terminated by George as part of "the retaliation against Mr. Kennedy that Mr. Nepola had been demanding and to which Sucharski had objection." (*Id.* ¶ 39.) Sucharski, in turn, was reassigned to a "distinct line of business established in June 2022 to supply after-market, spare products to customers in the commercial aerospace industry[,]" to which HHK allegedly dedicated no resources. (*Id.* ¶¶ 40–41.) At Nepola's request, Sucharski "transferred all sales information, sales contracts, quotes, purchase orders, customers, [and] client lists" to Mladjenovic, George, and other HHK staff, and his computer, workspace, and email credentials to Mladjenovic. (*Id.* ¶ 43.) Sucharski was also transferred to an office in Jupiter, Florida in connection with his new role and was told to work out of that office to maintain employment with HHK. (*Id.* ¶ 45.) On his only trip to that office in September 2022, Sucharski was allegedly threatened that his new division would "need to make money by January 2023 . . . to support his salary or else Mr. Nepola planned to 'cut [him] off.'" (*Id.* ¶ 46.) Still, Sucharski was allegedly never provided with sufficient resources to support the new business, and Nepola consistently avoided Sucharski's attempts at contact from August to October 2022. (*Id.* ¶ 47.)

On November 11, 2022, HHK sent Sucharski a document titled "Intellectual Property Acknowledgement" purportedly to verify in writing that he had not, and would not, misuse or disclose any Protected Information. (*Id.* ¶¶ 48–49.) The Intellectual Property Acknowledgement included, in relevant part, language suggesting: (1) it served to address concerns originating from HHK's customers' legal departments regarding how their intellectual property was being used (although it did not fully define the intellectual property in question); (2) HHK's customer's

6

information belonged to HHK; and (3) an indemnification provision. (*Id.* ¶¶ 49–51.) The Intellectual Property Acknowledgement also lacked a mandatory notice required by the Defend Trade Secrets Act, *see* 18 U.S.C. § 1833(b)(3)(A), immunizing employees for, and permitting retention or disclosure of, information related to protected employee activities, including whistleblowing activities. (*Id.* ¶ 52.) According to Sucharski, Nepola represented that Boeing (an HHK customer) demanded HHK create the Intellectual Property Acknowledgement but "failed to provide anything" by way of proof. (*Id.* ¶ 54.) Sucharski allegedly "confronted" Nepola about concerns the Intellectual Property Acknowledgement was "setting up employees of HHK to take the blame for HHK's own failures and misconduct." (*Id.*) Given his concerns regarding the Intellectual Property Acknowledgement as well as Nepola's allegedly unlawful and deceptive conduct in connection with the Recertification Audit, Sucharski contacted legal counsel, which angered Nepola, who then demanded Sucharski sign the agreement. (*Id.* ¶ 55.)

Sucharski did not refuse to sign the agreement but instead wrote an email in the evening of November 17, 2022, to Nepola and an HHK attorney in which he stated he had contacted counsel regarding the agreement and emphasized he did not have any copies of HHK or customer intellectual property in his possession. (*Id.* ¶ 56.) Roughly twelve hours after Sucharski's email, HHK terminated Sucharski in a letter dated November 17, 2022, which was electronically transmitted to him at 6:00 a.m. on November 18, 2022. (*Id.* ¶¶ 57, 59.) After the termination letter, Nepola nevertheless sent Sucharski a text message saying, "Sign the F[*]CKING form and send it to me and we will resume [the new business] plan together[,]" allegedly to prevent Sucharski from becoming a whistleblower. (*Id.* ¶ 58.) Sucharski also received multiple instructions via letters and in-person meetings, including with Mladjenovic, to turn over company materials still in Sucharski's possession and "promptly return or destroy" data. (*Id.* ¶¶ 63–64.)

Later, on November 23, 2022, Sucharski and his wife[1] incorporated Saje in Connecticut; Saje is 100% owned by Mrs. Sucharski and provides "benefits with various government contracting programs and with certain bids and initiatives." (*Id.* ¶¶ 67, 69.) At the time of the filing of this action, Saje was "focused only on the manufacture of NAS77 bushings and other similar NAS standard bushings[,]" which are "open bid, open source" and "not even manufactured or solicited by HHK and were not at any time during Sucharski's employment with HHK." (*Id.* ¶ 74.) Moreover, Saje: (1) did not occupy office space until March 1, 2023; (2) does not currently have the required certifications; (3) does not have a quality management system in place; (4) has not yet earned any revenue; (5) does not produce the same products as HHK; and (6) that, regardless of the above, "by creating a competing company engaged in virtually the same manufacturing and sales activities as [HHK], it is inevitable that Mr. Sucharski will necessarily use and disclose [HHK]'s Protected Information for his own personal gain and to create an unfair competitive advantage for Saje." (*Id.* ¶¶ 71–73.)

One week after Saje's formation, on November 30, 2022, HHK published an allegedly defamatory post on LinkedIn ("LinkedIn post") titled "Termination of Company President Steve Sucharski," which included "a variety of broad industry-related tags so that it would not only be picked up among Sucharski's over 1,500 connections . . . but also all others worldwide who searched for content with those industry tags"; however, the content of the LinkedIn post itself only discussed Sucharski's termination and did not mention any other companies, including Saje. (*Id.* ¶ 78.) According to Defendants,

---

[1] Although Mrs. Sucharski was originally a named defendant in this action (ECF No. 1), all claims against her—namely, Counts I, II, III, and VII alleging misappropriation of trade secrets and unjust enrichment—have been dismissed. (*See* ECF No. 38.) As such, she is no longer a party to this lawsuit.

> The LinkedIn post's reference to Sucharski and Sucharski's personal LinkedIn profile is not unrelated to Saje because Saje is marketed through and referenced on Sucharski's personal LinkedIn page given his role as Saje executive and because anyone in the industry looking to partner with a new entrant such as Saje first reviews the background regarding the entrant and its principles [sic.]

(*Id.* ¶ 80.) Additionally, the LinkedIn post incorrectly stated Sucharski was the only HHK employee to not sign the Intellectual Property Acknowledgement, even though multiple HHK employees elected not to sign it. (*Id.* ¶ 82.)

In addition to the LinkedIn post, HHK allegedly spread "similar falsehoods" about Saje in the press and to others within the industry, including in two Law360 articles. (*Id.* ¶ 83.) The articles, published on March 24, 2023, and April 11, 2023, "included summaries of HHK's defamatory pleading" and "parroted HHK's defamatory allegations . . . and provid[ed] an embedded link to the Complaint in which those defamatory allegations were made by HHK[.]" (*Id.* ¶¶ 84–85.) However, HHK's only comments, made through a representative, were that it "declined to comment aside from its filing" and that "Ho-Ho-Kus stands by the allegations in its Complaint[.]" (*Id.* ¶¶ 85–86.) Furthermore, HHK "has interfered with Saje's business relationships using similar defamatory statements" which were made to "a high-level aerospace individual close with Mr. Nepola,"—a "top industry player" who has "communicated to other industry representatives" and "industry participants" those same statements. (*Id.* ¶¶ 87, 112.)

Ultimately, Defendants contend HHK—specifically, Nepola—engaged in a series of "unlawful, deceptive, and unsafe business practices," intimidation of employees, and mismanagement and refusal to provide needed resources ultimately resulting in the suspension following the June 2022 audit of HHK's critical AS9100 certification in or around August 2022. (*Id.* ¶ 1.) Defendants further allege Nepola "set out to scapegoat Sucharski" for the suspension of HHK's AS9100 certification and "engag[ed] in a pattern of retaliatory conduct culminating in

Sucharski's termination on November 18, 2022." (*Id.*) Consequently, Defendants bring the following two counterclaims: (1) wrongful termination under the New Jersey Conscientious Employee Protection Act ("CEPA"), *see* N.J. Stat. Ann. §§ 34:19-1, *et seq.*, (*id.* ¶¶ 89–110); and (2) common law defamation and/or trade libel (*id.* ¶¶ 111–16).

### B. Procedural History

On December 17, 2024, Defendants filed their Answer and Second Amended Counterclaims. (ECF No. 61.) HHK filed an Opposition (ECF No. 67) on February 25, 2025, pursuant to the stipulation and consent order (ECF No. 66) entered on February 19, 2025, outlining the deadlines for the parties' filings regarding the Motion. HHK filed a Reply on March 11, 2025. (ECF No. 68.)

## II.    LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (alterations in original) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 at 286. Instead, assuming the factual allegations in the complaint are true, those

"[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citations omitted). In assessing plausibility, the Court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, it is clear that conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must now set out "sufficient factual matter" to show that the claim is facially plausible, allowing "the

11

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See id.* at 670.

While, generally, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

## III. DECISION

HHK requests this Court dismiss both of Defendants' Second Amended Counterclaims in which Sucharski alleges wrongful termination under CEPA and Saje asserts common law claims of defamation and/or trade libel. The Court addresses each in turn.

### A. Wrongful Termination under CEPA (Counterclaim I)

HHK argues that Defendants' Second Amended Counterclaims "play[] fast and loose with the Court" by changing critical facts about a former co-worker of Sucharski's at HHK to remedy the deficiencies identified by the Court in the causation element of the CEPA counterclaim, and that such attempts still fail to prove the necessary causal connection between Sucharski's whistleblowing activities and his subsequent termination by HHK. (ECF No. 64 at 1, 12.)

12

In the Second Amended Counterclaims, Defendants contend HHK wrongfully terminated Sucharski in violation of CEPA for various actions, refusals to take certain actions, and objections raised in response to alleged conduct by Nepola. (*See* ECF No. 61 ¶¶ 89–110.) Specifically, Defendants point to: (1) "concerns" raised by Sucharski regarding "unlawful, deceptive, and unsafe conduct mandated by" Nepola leading up to, including, and after the Recertification Audit in June 2022; (2) "Sucharski's objection to and failure to abide by certain of those mandates," including Nepola's alleged attempts to doctor records and circumvent requirements for certification; and (3) Sucharski's failure to sign the Intellectual Property Acknowledgement, which he considered unlawful. (*Id.* ¶ 91.)

CEPA prohibits employers from taking retaliatory action against an employee who disagrees with or refuses to engage in illegal or otherwise unethical workplace activities. *See* N.J. Stat. Ann. § 34:19-1; *Pierre v. Otsuka Am. Pharm.*, Civ. A. No. 23-21848, 2024 WL 1704847, at *6 (D.N.J. Apr. 19, 2024). To state a claim under CEPA, the New Jersey Supreme Court has explained that a plaintiff must sufficiently allege: (1) a reasonable belief the complained-of employer conduct violated a law, rule, regulation, or public policy, or is fraudulent or criminal; (2) whistleblowing activity; (3) an adverse employment action; and (4) a causal connection between the whistleblowing activity and the adverse employment action. *See Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003); *Young v. Twp. of Irvington*, 629 F. App'x 352, 356 (3d Cir. 2015). The burden of "'making a prima facie [CEPA] case is relatively easy to meet,' and is satisfied 'when sufficient evidence is offered such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons.'" *Griffin v. Metromedia Energy, Inc.*, Civ. A. No. 10-3739, 2011 WL 12872504, at *2 (D.N.J. Feb. 7, 2011) (quoting *Bowles v. City of Camden*, 993 F. Supp. 255, 264–65 (D.N.J. 1998)). Indeed, the

New Jersey Supreme Court has described CEPA as "remedial legislation . . . [which] 'should be construed liberally to effectuate its important social goal.'" *Dzwonar*, 828 A.2d at 901 (quoting *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994)).

It is undisputed that Sucharski was terminated from HHK, and that termination is an adverse employment action under CEPA § 34:19-2(e). The third element of a CEPA claim, then, is satisfied. Moreover, the Court found the elements of reasonable belief and whistleblowing activity were sufficiently pled in its prior opinion granting HHK's motion to dismiss Defendants' Amended Counterclaims. (*See* ECF No. 55.) The discussion that follows will therefore focus solely on the fourth element of causal connection.

### 1. Defendants Sufficiently Pled Causal Connection Between Sucharski's Whistleblowing Activity and His Termination by HHK

HHK generally argues that Defendants' Second Amended Counterclaims change critical facts about Mladjenovic, a site manager and co-worker of Sucharski's at HHK, in an attempt to remedy the deficiencies identified by the Court regarding causation. (ECF No. 64 at 1.) Specifically, HHK contends that the "[t]he recasting of Mladjenovic as a 'yes man' who never 'openly refused' Nepola's demands" is contradicted by Defendants' apparently unchanged Answer; HHK points to paragraph 31 of the Answer, which discusses Nepola's demand that Sucharski terminate multiple "site managers" who allegedly objected to Nepola's demands yet names only one other site manager besides Mladjenovic. (*Id.* at 11.) HHK claims Defendants admit Mladjenovic "expressed concerns or complaints" regarding Nepola's various actions through their allegation that Mladjenovic "agreed with the concerns raised by Sucharski," and takes the position the difference between allegedly agreeing with such concerns and openly refusing to comply is "mere dissembling" and ultimately unsupported. (*Id.* at 12 (citing ECF No. 61 ¶ 36).) HHK further argues Defendants' prior allegations concerning Mladjenovic's purportedly active and open refusal

to comply with certain of Nepola's demands constitute binding judicial admissions which Defendants are judicially estopped from denying; HHK contends the positions Defendants have taken regarding Mladjenovic are irreconcilable, made in bad faith, and no lesser sanction would be appropriate, thereby satisfying the three elements for judicial estoppel to apply. (*Id.* at 13–15.)

In their opposition to the Motion, Defendants argue HHK's inference that the phrase "site managers" necessarily includes Mladjenovic is incorrect, as Defendants never argued "Mladjenovic was a whistleblower or that he voiced objections to the unlawful demands at issue[,]" and assert the phrase "site managers" refers instead to "operations manager Stuart Kennedy and quality assurance manager Mike Provost—the only managers Nepola demanded Sucharski terminate." (ECF No. 67 at 1.) Defendants contend they addressed this issue for the first time in their Second Amended Counterclaims to "eliminat[e] any conceivable ambiguity," and insist Sucharski was terminated for specific objections made "to Nepola's unlawful demands" and not any "generalized grievances" Mladjenovic or others had with respect to "HHK's lack of focus on quality." (*Id.* at 2.) Specifically, Defendants claim their Second Amended Counterclaims clarify the unlawful reasons underpinning Sucharski's termination, and their CEPA counterclaim arises out of Sucharski's specific objections to four demands made by Nepola and HHK:

> (1) "manipulation of records and processes and 'pencil whipping' with respect to the Audit and demands to fire or silence Kennedy and Provost;"
>
> (2) "employment of a passivation tank at HHK's Virginia facility without standard safety measures and without complying with industry standards and customer specifications;"
>
> (3) "termination of Kennedy in retaliation for resisting Nepola's unlawful demand to employ the passivation tank;" and
>
> (4) "execution of the overbroad, unenforceable, and illegal IP Acknowledgement under a threat of termination . . . and in breach of whistleblower protections.

(*Id.* at 13.)

Their counterclaims, as amended, purportedly show the retention and promotion of Mladjenovic was done "to ensure [Nepola] had 'yes men' in place . . . to do his bidding and to enable him to have direct management . . . without an intermediary President like Sucharski who . . . served as a buffer." (*Id.* at 14.) HHK's argument in favor of judicial estoppel shows, according to Defendants, that HHK "finds itself with no good option because the Court already rejected most of its dismissal arguments and any arguments regarding the [Second Amended Counterclaims] are foreclosed by the substantial factual allegations and detail, . . . which are to be accepted as true for purposes of this motion[,]" and HHK cites no case law showing the doctrine applies "to dismiss a pleading amended in response to a court order granting leave to amend[.]" (*Id.*) Importantly, Defendants claim HHK cannot establish the prerequisites for judicial estoppel because the positions Defendants have taken are not irreconcilably different because: (1) the allegations in the Second Amended Counterclaims merely "broaden[] th[e] allegation [with respect to who comprised site managers] to include Kennedy" (*id.* at 22); (2) there was no bad faith in the amendments, which were made "*at the invitation of this Court*" (*id.* at 25 (emphasis in original)); and (3) ample alternative, lesser remedies would be acceptable in lieu of the extreme remedy of judicial estoppel, including, for example, granting Defendants further leave to amend Paragraph 31 of the Answer on which HHK centers its argument here (*id.* at 26–27).

Moreover, Defendants argue HHK's conflation of the allegations in the Second Amended Counterclaims with the Answer should be ignored because answers may not properly be relied upon in assessing the sufficiency of independent counterclaims on a motion to dismiss, and that Defendants have met their burden in showing causation as it requires a showing that "protected activity 'was more likely than not a determinative factor in the decision'" to terminate Sucharski's

16

employment, not prove it was the only possible basis for it. (*Id.* at 15–16 (citing *Robles v. U.S. Env't Universal Servs., Inc.*, 469 F. App'x 104, 107 (3d Cir. 2012) (internal citation omitted).) Defendants assert their allegations that Sucharski was "subject to a pattern of retaliation beginning with his demotion and pretextual reassignment and culminating in his termination" are supported by the temporal proximity of the chain of events and the circumstantial evidence alleged of the retaliation itself, which Defendants suggest is "amplified—not undercut" by the allegations in the Second Amended Counterclaims concerning Mladjenovic's promotion and Nepola's alleged motivation for it. (*Id.* at 17–20.)

To survive a motion to dismiss a CEPA claim, a plaintiff must adequately allege a causal connection between the whistleblowing activity and the adverse employment action. *See Griffin*, 2011 WL 12872504, at *3. This means plaintiff must avoid conclusory allegations and instead include enough facts from which "the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." *Id.* ("Plaintiff cannot satisfy the fourth prong (causal connection) simply by satisfying the second and third prongs (whistle[]blowing activity and adverse employment action) and then stating in a conclusory fashion that the termination was in retaliation for the whistle[]blowing activity."). In some cases, courts have found temporal proximity between the whistleblowing activity and the challenged employer action to be so "'unusually suggestive' of retaliatory conduct as to obviate the need for additional allegations to establish the causal nexus," though courts are generally reluctant to infer a causal nexus based on temporal proximity alone. *Paskas v. United Parcel Serv., Inc.*, Civ. A. No. 23-1162, 2023 WL 9017080, at *6 (D.N.J. Dec. 29, 2023) (quoting *Young v. Hobart W. Grp.*, 897 A.2d 1063, 1073 (N.J. Super. Ct. App. Div. 2005)). Where temporal proximity is not found to be unusually suggestive, plaintiffs may still succeed in establishing a causal

connection through other types of circumstantial evidence, such as a pattern of antagonism or pretext. *Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 856 (D.N.J. 2019).

Here, the Court finds Defendants have now sufficiently pled a causal connection between Sucharski's protected whistleblowing activities and his termination by HHK. The Second Amended Counterclaims now show Sucharski was not alone in voicing concerns and engaging in whistleblowing activity, but that he alone was met with termination. (*See* ECF No. 61 ¶¶ 26–28, 33–42.) Defendants argue the Court should focus on Sucharski's allegedly pretextual reassignment to HHK's after-market line of business as strong circumstantial evidence of the causal connection between his whistleblowing activities and termination. (ECF No. 67 at 17.) The Court finds the Second Amended Counterclaims sufficiently remedy deficiencies identified in the prior opinion (*see* ECF No. 55 at 30–31), and provide a coherent and convincing explanation for Sucharski's reassignment and ultimate termination that is consistent with an inference of retaliatory motive and supported by specific allegations showing Sucharski was treated less favorably than those other employees for engaging in the same activity. *See Cohen*, 419 F. Supp. 3d at 853. The counterclaims as amended illustrate Sucharski raised objections about various activities—such as the alleged demands to feign conformity with industry regulations and customer specifications with respect to the June 2022 Recertification Audit as well as the events surrounding the passivation tank at the Virginia site which purportedly lacked necessary safety measures—and otherwise expressly declined to acquiesce to other demands made by Nepola, and was reassigned and ultimately terminated shortly thereafter. (*See, e.g.*, ECF No. 61 ¶¶ 1–2, 17, 24–27, 55, 91–92.) With the new explanation of Mladjenovic's activities and the clarification of "site managers" (*id.* ¶¶ 28, 35–37, 39, 42–43, 53–54; ECF No. 67 at 1, 22–23), the Second Amended Counterclaims, the allegations of which the Court is required to accept as true at this stage, allow the Court to

comfortably infer an unlawful retaliatory motive for Sucharski's termination, which appears to stand alone and apart from HHK's treatment of Sucharski's various co-workers, including Mladjenovic himself.

The Court is also not convinced by HHK's argument that the doctrine of judicial estoppel should prevent Defendants from amending their counterclaims as they did. The Third Circuit requires three elements to apply judicial estoppel: (1) "the party in question must have adopted irreconcilably inconsistent positions;" (2) "the party must have adopted these positions in 'bad faith'"; and (3) "there must be a showing that judicial estoppel is tailored to address the harm and that no lesser sanction would be sufficient." *Shire Lab'ys, Inc. v. Corepharma, LLC*, Civ. A. No. 06-2266, 2008 WL 4822186, at *4 (D.N.J. Nov. 3, 2008) (citing *Chao v. Roy's Constr., Inc.*, 517 F.3d 180, 186 (3d Cir. 2008)). A court weighing these factors "must be mindful that judicial estoppel is an extraordinary remedy to be invoked only 'when a party's inconsistent behavior will otherwise result in a miscarriage of justice.'" *Rivet v. Office Depot, Inc.*, Civ. A. No. 12-02992, 2015 WL 9308246, at *2 (D.N.J. Dec. 22, 2015) (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996) (internal citations omitted)). Here, the positions concerning Mladjenovic are not irreconcilably inconsistent because the change may easily be explained by Defendants learning new information that casts events in a new light. *See, e.g.*, *Lenox Corp. v. Robedee*, Civ. A. No. 15-1654, 2016 WL 3032686, at *4 (D.N.J. May 26, 2016) ("It is entirely possible that an impression can change when new facts are learned."). It is well worth keeping in mind that no discovery has yet taken place, so HHK and Defendants are both equipped with only the information and documents they have on hand, with much yet to be uncovered in the stages to come. Furthermore, even if the positions were inconsistent, the Court does not find bad faith in the mere fact that Defendants amended their counterclaims as that

procedural act very commonly involves deleting, reconfiguring, and adding new factual allegations. *See W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172 (3d Cir. 2013) ("Plaintiffs routinely amend complaints to correct factual inadequacies in response to a motion to dismiss . . . . That is so even when the proposed amendment flatly contradicts the initial allegation."). Indeed, as Defendants rightly point out, their amendments were made in direct response to the Court granting them leave to amend to cure identified deficiencies involving Mladjenovic and his alleged involvement or lack thereof in Sucharski's whistleblowing activities and related events. (ECF No. 67 at 25.)

Additionally, HHK's argument that Defendants' consistent statements regarding Mladjenovic's alleged concerns and objections to Nepola's demands raised "in seven separate submissions to the Court, including a sworn Declaration from Sucharski" constitute binding judicial admissions is incorrect on the law. HHK's reliance on *Berckeley Investment Group, Ltd. v. Colkitt* is illustrative as it cites to a string of cases which all explain "judicial admissions" are "*formal concessions* in the pleadings, or *stipulations* by the party or its counsel," and do not include factual allegations in claims or counterclaims which may be amended as of right or with leave. 455 F.3d 195, 211 n.20 (citing *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004) (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995)) (emphasis added)). Indeed, over half a century ago, the Third Circuit explained that amended pleadings are not judicial admissions. *See Giannone v. U.S. Steel Corp.*, 238 F.2d 544, 547 (3d Cir. 1956) ("By the weight of authority even withdrawn or superseded pleadings are admissible"). Even assuming, *arguendo*, that the allegations in question constitute judicial admissions, such statements can be withdrawn by subsequent amendment, as was the case here. *See Judon v. Travelers Prop. Cas. Co. of Am.*, 773 F.3d 495, 503 n.6 (3d Cir. 2014) (citing *W. Run Student Hous. Assocs.*, 712 F.3d at 171 ("This

Court and several of our sister courts have recognized that judicial admissions may be withdrawn by amendment.")).

For these reasons, HHK's Motion to Dismiss is **DENIED** with respect to Defendants' wrongful termination counterclaim.

### B.  Common Law Defamation and/or Trade Libel (Counterclaim II)

HHK asserts Defendants' amended counterclaims for defamation and/or trade libel "plead no new facts" and must fail. (ECF No. 64 at 16.) It argues Defendants again fail to state a claim for defamation or trade libel because the allegedly defamatory and libelous statements made by HHK are "vague and non-specific" (*id.*), "relate[] solely to Sucharski, not Saje" (*id.* at 17), and are opinions or otherwise facially neutral (*id.* at 17–18). In their Second Amended Counterclaims and opposition brief, Defendants contend HHK engaged in defamation and/or trade libel through "three independent groups" of statements, one published on LinkedIn, a second in two Law360 articles, and a third communicated directly to aerospace customers. (ECF No. 67 at 27–37; *see* ECF No. 61 ¶¶ 112–116.)

"The law of defamation exists to achieve the proper balance between protecting reputation and protecting free speech." *DeAngelis v. Hill*, 847 A.2d. 1261, 1267 (N.J. 2004) (quoting *Ward v. Zelikovsky*, 643 A.2d 972, 978 (N.J. 1994)). It protects the right of people to "be free to enjoy their reputations without suffering false and defamatory attacks." *Okeke v. Anekwe*, Dkt. No. A-3391-20, 2022 WL 2674944, at *5 (N.J. Super. Ct. App. Div. July 12, 2022). Indeed, a defendant can be found liable for defamation for publishing a false statement that harms another's reputation. *Id.* The tort of defamation requires plaintiffs to prove: "defendant[] made a false and defamatory statement concerning [the plaintiff]; (2) [] the statement was communicated to another person (and was not privileged); and (3) [] defendant[] acted negligently or with actual malice[,]" with

negligence evaluated under a preponderance of the evidence standard and malice under a clear and convincing evidence standard. *Id.* (quoting *G.D. v. Kenny*, 15 A.3d 300, 310 (N.J. 2011)). With regard to the first prong, whether a statement is false depends on if it is one of fact or opinion; whereas statements of fact can be objectively proved or disproved, opinion statements "reflect a person's state of mind" and are therefore protected. *Id.* (quoting *NuWave Inv. Corp. v. Hyman Beck & Co.*, 75 A.3d 1241, 1250 (N.J. Super. App. Div. 2013). Opinions can be actionable as defamation, however, where they "impl[y] 'reasonably specific assertions' of underlying objective facts that are false.'" *Id.* A defamatory statement is one which "impute[s] . . . 'fraud, deceit, dishonesty, or reprehensible conduct'" to the plaintiff. *Gillon v. Bernstein*, 218 F. Supp. 3d 285, 296 (D.N.J. 2016) (quoting *Dairy Stores, Inc. v. Sentinel Pub. Co., Inc.*, 516 A.2d 220, 238 (N.J. 1986) (Garibaldi, J., concurring)). Courts have explained the aspect of whether a statement is defamatory is generally a legal question subject to a court's discretion, though it could be subject to a jury's deliberations where the statement is ambiguous and could be reasonably defined as both a defamatory and opinion statement. *Id.* (citing *Ward*, 643 A.2d at 978).

Mirroring those of defamation, the elements of trade libel—also known as product disparagement—in New Jersey are: "(1) publication; (2) with malice; (3) of false allegations concerning another's property, product, or business; and (4) special—i.e., pecuniary—damages." *Benecard Serv., Inc. v. Allied World Specialty Ins. Co.*, Civ. A. No. 15-8593, 2020 WL 2842151, at *13 (D.N.J. May 31, 2020) (quoting *Albion Eng'g Co. v. Hartford Fire Ins. Co.*, 779 F. App'x 85, 88 (3d Cir. 2019)); *see also Gillon*, 218 F. Supp. 3d at 294. Unlike defamation, however, trade libel "is an offshoot of the cause of action for interference with contractual relations," *Gillon*, 218 F. Supp. 3d at 295, and as such requires some proof showing "a material and substantial part in leading others not to deal with plaintiff." *Patel v. Soriano*, 848 A.2d 803, 835 (N.J. Super. App.

Div. 2004). A statement may satisfy the elements of both defamation and trade libel simultaneously. *Gillon*, 218 F. Supp. 3d at 296.

While the Second Amended Counterclaims identify four allegedly defamatory statements—the same four statements identified in the Amended Counterclaims which the Court has already found insufficient to support a defamation or trade libel claim in favor of Sucharski, much less for Saje (*see* ECF No. 55 at 31–35)—Defendants now argue in favor of reviewing the statements through the lens of the three groups identified. (ECF No. 67 at 27–37; *see* ECF No. 61 ¶¶ 112–116.) Given there are only two new sets of factual allegations before the Court (namely, the Law360 articles and some slightly more specific information regarding publication to third parties in the industry), the Court will address each in turn.

### 1.   The March 24 and April 11, 2023 Law360 Articles

HHK asserts its statements to Law360—specifically, that the HHK representative "declined to comment aside from its filing" and the company "stands by the allegations in its Complaint"—are "absolutely privileged" as statements made within judicial proceedings. (ECF No. 64 at 16 (quoting *Dairy Stores*, 516 A.2d at 226).) Defendants dispute the statements are protected, arguing that while the litigation privilege protects otherwise defamatory statements made in complaints and other court filings, it "does not extend to or immunize a party for out-of-court statements repeating or republishing those falsehoods or directing third parties to them." (ECF No. 67 at 35 (citing *Dill v. Yellin*, 725 F. Supp. 3d 471, 488 (D.N.J. 2024)).)

New Jersey law has long shielded "certain statements, such as those made in judicial, legislative, or administrative proceedings" with an absolute privilege from claims of defamation "because the need for unfettered expression is crucial to the public weal." *Dairy Stores*, 516 A.2d at 226. Statements made by a party or her attorney to the media regarding the allegations of an

allegedly defamatory complaint are protected "by the same qualified privilege extended to others who publish the contents of a filed complaint." *Cappello v. Scott*, 644 A.2d 102, 103 (N.J. Super. Ct. App. Div. 1994). Notwithstanding this protection, the privilege may be lost when such republication of allegedly defamatory allegations is done with malice. *Arista Recs., Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411, 426 (D.N.J. 2005) ("[C]ase law is clear that, in order to overcome this qualified privilege, Defendants must plead malice."); *see also Bender v. Smith Barney, Harris Upham & Co., Inc.*, 901 F. Supp. 863, 871 (D.N.J. 1994) ("[T]he purposeful dissemination of defamatory allegations contained in a pleading, for purposes of obtaining publicity of the allegation, causes otherwise privileged allegations to lose their protected status when published.")

The Court finds the Law360 articles do not give rise to a defamation or trade libel claim. HHK's only comments to Law360 were effectively 'no comment'—in other words, the Second Amended Counterclaims allege HHK's representative made only two statements, one "declin[ing] to comment aside from its filing" and the second stating "[HHK] stands by the allegations in its Complaint." (ECF No. 61 ¶¶ 85–86.) More importantly, Defendants list passages from the articles containing allegedly defamatory statements, but it appears the reporter gleaned them directly from the Complaint, *not* from the HHK representative. (*Id.*; *see* ECF No. 67 at 33–35.) There is no evidence HHK invited the press coverage in a way that "serves only the interest of the distributor in getting one side of the story out first or most vividly[,]" or otherwise affirmatively distributed or published a court filing, actions which would rightly forfeit the litigation privilege. *Bender*, 901 F. Supp. at 871 (quoting *Citizens State Bank of N.J. v. Libertelli*, 521 A.2d 867, 871 (N.J. Super. Ct. App. Div. 1987)). In fact, not only do Defendants fail to allege HHK acted with any malice, the Court also finds HHK's two "no-comment" comments were the appropriate ones to make in

the circumstances to preserve the integrity of the judicial process and maintain a respectful distance with the media concerning ongoing litigation.

Additionally, Defendants' reliance on *Bender* highlights why the complained-of statements cannot sustain a defamation or trade libel claim. 901 F. Supp. at 871. Unlike in *Bender*, in which a plaintiff volunteered a copy of defamatory pleadings to a magazine reporter with the goal of engendering coverage of the legal claims, here, Law360 contacted HHK representatives, not the other way around, and HHK representatives gave no substantive comments besides resting on the publicly-available Complaint. (*See* ECF No. 61 ¶¶ 85–86.) Again, Defendants do not allege HHK sought the press coverage or otherwise intentionally "purposeful[ly] disseminat[ed]" the complained-of statements. *Bender*, 901 F. Supp. at 871.

## 2.    Allegedly Defamatory Statements to Aerospace Customers

HHK argues Defendants' allegations concerning defamatory statements made to "industry participants," a "high-level aerospace individual" and a "top industry player" are insufficient to support a defamation and/or trade libel claim as they are "vague and non-specific." (ECF No. 64 at 16 (quoting ECF No. 61 ¶¶ 87, 112).) Defendants contend they have included "sufficient details for Plaintiff to know who they are referring to." (ECF No. 67 at 36.) They further note they expressly identify Boeing Global Services and Boeing Distribution Services, Inc. "as partners with whom Plaintiff has tortiously interfered." (*Id.*)

To sufficiently state a claim for defamation, a plaintiff must allege, "with specific particularity," that a defendant made a specific false, defamatory statement concerning plaintiff and communicated that statement to a specific third party. *Kennedy v. Am. Airlines, Inc.*, 195 F. Supp. 3d 646, 655 (D.N.J. 2016); *see Torrey v. New Jersey*, Civ. A. No. 13-1192, 2014 WL 941308, at *20 (D.N.J. Mar. 11, 2014) ("Under New Jersey law, a plaintiff must sufficiently identify the

party making the defamatory statements and the circumstances in which th[o]se statements were publicized."); *Foxtons, Inc. v. Cirri Germain Realty*, Dkt. No. L-1421-06, 2008 WL 465653, at *5 (N.J. Super. Ct. App. Div. Feb. 22, 2008) (holding it is a "plaintiff's significant burden to plead with specificity sufficient facts to demonstrate that the [allegedly defamatory statement] was 'of and concerning' [plaintiff] without any further discovery"); *F.D.I.C. v. Bathgate*, 27 F.3d 850, 875 (3d Cir. 1994) (finding a plaintiff failed to "plead the alleged defamatory statements with particularity"); *Zoneraich v. Overlook Hosp.*, 514 A.2d 53, 62 (N.J. Super. Ct. App. Div. 1986) *cert. denied*, 526 A.2d 126 (N.J. 1986) (providing a plaintiff must specify the "when, where, by which defendants and by what words" of a defamation claim). Indeed, "pleadings reciting mere conclusions without facts . . . do not justify a lawsuit." *Neuwirth v. State*, 300 A.3d 274, 282 (N.J. Super. Ct. App. Div. 2023).

Here, the Court finds Defendants' contention that allegedly defamatory statements were made to anonymous aerospace customers and without any information regarding the date, time, or circumstances of the alleged publication lacks the specificity and particularity required to survive dismissal. *See Kennedy*, 195 F. Supp. 3d at 655; *Torrey*, 2014 WL 941308, at *20; *Foxtons*, 2008 WL 465653, at *5; *Bathgate*, 27 F.3d at 875; *Zoneraich*, 514 A.2d at 62. The identification of "industry participants," a "high-level aerospace individual" and a "top industry player" as third parties to whom the allegedly defamatory statements were publicized are woefully insufficient as the third parties remain practically unidentifiable and anonymous. (ECF No. 61 ¶¶ 87, 111.) Because the Second Amended Counterclaims provide no new facts in this regard, this Court's previous ruling that:

> none of [the complained-of] statements can serve as the basis for either a defamation or trade libel claim because: (1) Defendants provide details only with regards to the LinkedIn Post and none of these statements appear within that post, either explicitly or

> implicitly; and (2) the post refers only to Sucharski, not Saje, whereas Defendants specifically claim these statements defame Saje[,]

stands unchanged. (ECF No. 55 at 33–34.) Furthermore, Defendants' identification of two Boeing-related companies does not save their defamation counterclaim because the identifications are made with respect to an unasserted counterclaim of tortious interference and otherwise lack any discernible context, such as the content of what was said, when, and to whom within either company. Moreover, Defendants' argument they provided "sufficient details for Plaintiff to know who they are referring to" is speculative and no substitute for providing the Court with the required information. (ECF No. 67 at 36.)

For these reasons, HHK's motion to dismiss is **GRANTED** as to the defamation and/or trade libel counterclaim.

## IV.    CONCLUSION

For the reasons set forth above, and for good cause having been shown, HHK's Motion to Dismiss Defendants' Second Amended Counterclaims (ECF No. 64) is **GRANTED** in part and **DENIED** in part. Specifically, HHK's Motion is **GRANTED** with respect to Defendants' defamation and/or trade libel counterclaim and **DENIED** with respect to Defendants' CEPA wrongful termination counterclaim.

Date: August 21, 2025                    /s/ *Brian R. Martinotti*
                                         **HON. BRIAN R. MARTINOTTI**
                                         **UNITED STATES DISTRICT JUDGE**